POSNER, Circuit Judge.
On July 5, 2013, the Governor of Wisconsin signed into law a statute that the Wisconsin legislature had passed the previous month. So far as relates to this appeal the statute prohibits a doctor, under threat of heavy penalties if he defies the prohibition, from performing an abortion (and in Wisconsin only doctors are allowed to perform abortions, Wis. Stat. § 940.15(5)) unless he has admitting privi- ■ leges at a hospital no more than 80 miles from the clinic in which the abortion is performed. Wis. Stat. § 253.095(2).
A doctor granted admitting privileges by a hospital becomes a member of the hospital’s staff and is authorized to admit patients to that hospital and to treat them there; that is the meaning of “admitting privileges.” Of course any doctor (in fact any person) can bring a patient to an emergency room to be treated by the doctors employed there. A hospital that has an emergency room is obliged to admit and to treat a patient requiring emergency care even if the patient is uninsured. 42 U.S.C. § 1395dd(b)(l). Moreover, all Wisconsin abortion clinics are required by law (see Wis. Admin. Code Med. § 11.04(l)(g)) to have transfer agreements with local hospitals to streamline the process of transferring the patient from the abortion clinic to a nearby hospital, which could be important if the patient would be better served elsewhere in a hospital than the emergency room — though in that event the emergency room doctors would send her to the part of the hospital in which she could best be served.
Planned Parenthood of Wisconsin and Milwaukee Women’s Medical Services (also known as Affiliated Medical Services, commonly referred to as AMS) — which op *910 erate the only four abortion clinics in Wisconsin — -joined by two doctors employed by Planned Parenthood, filed suit on the day the governor signed the statute into law. The plaintiffs challenged the statute’s constitutionality under 42 U.S.C. § 1983, which provides a tort remedy for violations of federal law by state officials or other state employees. The plaintiffs sought and obtained first a temporary restraining order and then a preliminary injunction against enforcement of the statute (not the entire statute, just the provision regarding admitting privileges for abortion doctors — but for simplicity we’ll generally call that provision “the statute”).
The defendants (the Wisconsin attorney general, Wisconsin district attorneys, the Wisconsin Secretary of the Department of Safety and Professional Services, and members of the state’s Medical Examining Board) appealed from the grant of the preliminary injunction. 28 U.S.C. § 1292(a)(1). We affirmed the grant in Planned Parenthood of Wisconsin, Inc. v. Van Hollen, 738 F.3d 786 (7th Cir.2013). That cleared the way for the district judge to conduct a full trial, which he did. The trial culminated in his granting a permanent injunction against enforcement of th'e statute, which was the relief sought by the plaintiffs. The defendants (essentially, the state) have again appealed, arguing that the statute protects the health of women who experience complications from an abortion. The plaintiffs disagree, arguing that if allowed to go into effect the statute would not protect the health of women but would simply make it more difficult for them to obtain abortions, period, in violation of constitutional rights recognized by the U.S. Supreme Court.
There might appear to be a question about standing to sue, since the principal victims of the statute are women desiring abortions and none of them is a plaintiff. But we explained in our opinion upholding the preliminary injunction that the plaintiffs have standing. The cases are legion that allow an abortion provider, such as Planned Parenthood of Wisconsin or AMS, to sue to enjoin as violations of federal law (hence litigable under 42 U.S.C. § 1983) state laws that restrict abortion. These eases emphasize not the harm to the abortion clinic of making abortions very difficult to obtain legally, though that might be an alternative ground for recognizing a clinic’s standing, but rather “the confidential nature of the physician-patient relationship and the difficulty for patients of directly vindicating their rights without compromising their privacy,” as a result of which “the Supreme Court has entertained both broad facial challenges and pre-en-forcement as-applied challenges to abortion laws brought by physicians on behalf of their patients.” Isaacson v. Horne, 716 F.3d 1213, 1221 (9th Cir.2013); see also Richard H. Fallon, Jr., “As-Applied and Facial Challenges and Third-Party Standing,” 113 Haro. L. Rev. 1321, 1359-61 (2000).
A related consideration, important in this case as we’ll see, is the heterogeneity of the class that is likely to be affected by the Wisconsin statute. If one of the abortion clinics in the state closes, placing increased demand on the others, some women wanting an abortion will experience delay in obtaining, or may even be unable to obtain, an abortion, yet not realize that the new law is likely to have been the cause. Those women would be unlikely to sue. Other women might be able to find an abortion doctor who had admitting privileges at a nearby hospital, yet still incur costs and delay because the law had reduced the number of doctors who are allowed to perform abortions. Suits to recover the costs, including some quantification of the cost of delay, would be awkward. A suit by clinics and doctors *911 seeking injunctive relief is more feasible and if successful gives the women what they want. If the clinics and doctors win, the patients win.
And finally the Supreme Court held in Doe v. Bolton, 410 U.S. 179, 188, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973) (the companion case to Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)), that abortion doctors (remember that the two individual plaintiffs in this case are doctors employed by abortion clinics) have first-party standing to challenge laws limiting abortion when, as in Doe and the present case as well, penalties for violation of the laws are visited on the doctors. Wis. Stat. §§ 253.095(3), (4); see Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 903-04, 909, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (plurality ' opinion); Planned Parenthood of Central Missouri v. Danforth, 428 U.S. 52, 62, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); Karlin v. Foust, 188 F.3d 446, 456 n. 5 (7th Cir.1999); Planned Parenthood of Wisconsin v. Doyle, 162 F.3d 463, 465 (7th Cir.1998).
Although signed into law on a Friday (July 5, 2013), Wisconsin’s statute required compliance — -the possession, by every doctor who performs abortions, of admitting privileges at a hospital within a 30-mile radius of each clinic at which the doctor performs abortions — by the following Sunday (July 7, 2013). See Wis. Stat. §§ 253.095(2), 991.11. There was no way an abortion doctor, or any other type of doctor for that matter, could obtain admitting privileges so quickly, and there wouldn’t have been a way even if the two days hadn’t been weekend days. As the district court found, it takes a minimum of one to three months to obtain admitting privileges and often much longer. It took ten months for one of the individual plaintiffs to obtain admitting privileges. It took eight months for the other one to obtain admitting privileges at one hospital and nine months for her to obtain them at another hospital. Moreover, hospitals are permitted rather than required to grant such privileges, and some may be reluctant to grant admitting privileges to abortion doctors because there is great hostility to abortion in Wisconsin, though as we’ll see hospitals have now granted such privileges to a number of the state’s abortion doctors.
States that have passed laws similar to Wisconsin’s have allowed much longer implementation time than a weekend — for example, Mississippi allowed 76 days from statutory approval date to effective date, Alabama 83 days, and Texas 103 days. 2012 Miss. Gen. Laws 331 (H.B. 1390), enjoined in Jackson Women’s Health Organization v. Currier, 760 F.3d 448 (5th Cir.2014); 2013 Ala. Legis. Serv.2013-79 (H.B. 57), enjoined in Planned Parenthood Southeast, Inc. v. Bentley, 951 F.Supp.2d 1280 (M.D.Ala.2013); 2013 Tex. Sess. Law Serv. 2nd Called Sess. Ch. 1 (H.B. 2), upheld in Planned Parenthood of Greater Texas Surgical Health Services v. Abbott, 748 F.3d 583 (5th Cir.2014). True, the statute had been passed by the Wisconsin legislature weeks rather than days before it took effect, but weeks aren’t enough time in which to get admitting privileges, and until the governor signed the law there could be no certainty that it would become law; until then the abortion doctors would not know whether they’d be required to obtain such privileges.
As of July 7 none of the doctors at either the AMS clinic (in Milwaukee) or Planned Parenthood’s Appleton clinic had admitting privileges at a hospital within the required 30-mile distance from the clinic, and neither did two of the doctors at Planned Parenthood’s Milwaukee clinic. On the date of oral argument of the appeal from the grant of the preliminary injunction — almost five months after the law *912 would have taken effect had it not been for that injunction and the temporary restraining order that preceded it — the application of one of the doctors for admitting privileges had been denied and none of the applications of the others had been granted. Had enforcement of the statute not been stayed, two of the state’s four abortion clinics — the one in Appleton (the only one north .of Milwaukee) and one of the Milwaukee clinics — would have had to shut down because none of their doctors had admitting privileges at a hospital within the prescribed radius; and the capacity of a third clinic to perform abortions would have shrunk in half.
The state points out that abortion doctors have now had more than two years since the statute was enacted in which to obtain admitting privileges. But the legislature’s intention to impose the two-day deadline, the effect of which would have been to force half the Wisconsin abortion clinics to close for months, is difficult to explain save as a method of preventing abortions that women have a constitutional right to obtain. The state tells us that “there is no evidence the [Wisconsin] Legislature knew AMS physicians would be unable to comply with the Act.” That in.sults the legislators’ intelligence. How could they have thought that an abortion doctor, or any doctor for that matter, could obtain admitting privileges in so short a time as allowed? The clinics would have had to close, and months would have passed before they could reopen.
The fixing of such a short deadline for obtaining admitting privileges, a deadline likely to deny many women the right to an abortion for a period of months while the abortion doctors tried to obtain those privileges, could be justified consistently with the Supreme Court’s abortion jurisprudence only if there were reason to believe that the health of women who have abortions is endangered if their abortion doctors don’t have admitting privileges. The district court correctly found that there is no reason to believe that. A woman who experiences- complications from an abortion (either while still at the clinic where the abortion was performed or at home afterward) will go to the nearest hospital, which will treat her regardless of whether her abortion doctor has admitting privileges. As pointed out in a brief filed by the American College of Obstetricians and Gynecologists, the American Medical Association, and the Wisconsin Medical Society, “it is accepted medical practice for hospital-based physicians to take over the care of a patient and whether the abortion provider has admitting privileges has no impact on the course of the patient’s treatment.” As Dr. Serdar Bulun, the expert witness appointed in this case by the district judge under Fed.R.Evid. 706, testified, the most important factor would not be admitting privileges, but whether there was a transfer agreement between the clinic and the hospital. As we’ve said, abortion doctors in Wisconsin are required to have such transfer agreements. See Wis. Admin. Code Med. § 11.04(l)(g). The treating doctor at the hospital probably would want to consult with the doctor who had performed the abortion, but for such a consultation the abortion doctor would not need admitting privileges.
As it happens, complications from an abortion are both rare and rarely dangerous — a fact that further attenuates the need for abortion doctors to have admitting privileges. Two studies cited in the amicus curiae brief filed by the American College of Obstetricians and Gynecologists et al. and credited by the district judge— Tracy A. Weitz et ah, “Safety of Aspiration Abortion Performed by Nurse Practitioners, Certified Nurse Midwives, and Physician Assistants Under a California Legal Waiver,” 103 Am. J. Public Health 454, *913 457-58 (2013), and Kelly Cleland et al., “Significant Adverse Events and Outcomes After Medical Abortion,” 121 Obstetrics & Gynecology 166,169 (2013) — find that complications occur in only 1 out of 112 physician-performed first-trimester aspiration abortions (the most common type of surgical abortion), and that 94 percent of those complications are “minor.” Weitz et al., supra, at 457-58 tab. 2. For medical abortion (abortion by pill), the rate of complications is only 1 in 153. Cleland et al., supra, at 169 tab. 2. The official Wisconsin figure for 2013 is even lower: 1 complication per 404 abortions of all types. And finally only 1 in 1937 physician-conducted aspiration abortions result in major complications (a category which includes hospital admissions), and 1 in 1732 medical abortions require hospital admission. Weitz et al., supra, at 456, 458-59; Cleland et al., supra, at 169 tab. 2.
These studies have found that the rate of complications is below 1 percent; in the case of complications requiring hospital admissions it is one-twentieth of 1 percent. The rate of complications for second-trimester surgical abortions is slightly higher — 1.3 percent. Anna C. Frick et al., “Effect of Prior Cesarean Delivery on Risk, of Second-Trimester Surgical Abortion Complications,” 115 Obstetrics & Gynecology 760 (2010). In the five-year period 2009 to 2013, only 12 women who had abortions at clinics in Wisconsin experienced complications requiring transfer from clinic to hospital. Fifteen additional women who had received abortions at a Planned Parenthood clinic and left the clinic without apparent complications later sought treatment at a hospital. The record does not contain a comparable figure for the AMS clinic. There is no evidence that any of these women received inadequate hospital care because the doctors who had performed their abortions lacked admitting privileges.
One doctor with extensive experience in obstetrics and gynecology told about a case in which a woman with a complication from an abortion might, he thought, have avoided a hysterectomy if her abortion doctor had called the hospital or had had admitting privileges. That is the only evidence in the record that any woman whose abortion resulted in a medical complication has ever, anywhere in the United States, been made worse off by being handed over by her abortion doctor to a gynecologist, ' or other specialist with relevant, expertise, employed by the hospital to which she’s taken. And the example doesn’t actually have anything to do with admitting privileges. The abortion doctor didn’t need admitting privileges at a hospital in order to call an ambulance to take his patient to the nearest hospital, or to communicate with the treating doctor at the hospital— neither of which he did. As the district judge found, in the case of abortion “any benefit of admitting privileges in terms of continuity of care is incrementally small.”
And as noted, Wisconsin abortion clinics — uniquely, it appears, among outpatient providers of medical services in Wisconsin — are required by law to adopt transfer protocols intended to assure prompt hospitalization of any abortion patient who experiences complications serious enough to require hospitalization. See Wis. Admin. Code Med. § 11.04(l)(g).
The state presented no other evidence of complications from abortions in Wisconsin that were not handled adequately by the hospitals in the state. And no documentation of a medical need for requiring abortion doctors to obtain admitting privileges had been presented to the Wisconsin legislature when it was deliberating on the bill that became the statute challenged in this case. The only medical evidence that had been submitted to the legislature had come *914 from a doctor representing the Wisconsin Medical Society — and she opposed requiring that abortion doctors obtain admitting privileges. The only testimony presented to the legislature that admitting privileges are important to continuity of care was presented by a representative of Wisconsin Right to Life who happens not to be a doctor. Indeed the legislative deliberations virtually ignored the provision concerning admitting privileges, focusing instead on another provision — a requirement not challenged in this suit that a woman seeking an abortion obtain an ultrasound examination of her uterus first (if she hadn’t done so already), which might induce her to change her mind about having an abortion. Wis. Stat. § 253.10(3)(c)(l)(gm).
No other procedure performed outside a hospital, even one as invasive as a surgical abortion, is required by Wisconsin law to be performed by doctors who have admitting privileges at hospitals within a specified radius of where the procedure is performed. And that is the case even for procedures performed when the patient is under general anesthesia, and even though more than a quarter of all surgical operations in the United States are now performed outside of hospitals. Karen A. Cullen et al., “Ambulatory Surgery in the United States, 2006,” Centers for Disease Control and Prevention: National Health Statistics Reports No. 11, Sept. 4, 2009, p. 5, www.cdc.gov/nchs/data/nhsr/nhsr011.pdf (visited Nov. 21, 2015, as was the other website cited in this opinion). And that is true even for such gynecological procedures as diagnostic dilation and curettage (D & C) (removal of tissue from the inside of the uterus), hysteroscopy (endoscopy of the uterus), and surgical completion of miscarriage (surgical removal of fetal tissue remaining in the uterus after a miscarriage, which is a spontaneous abortion rather than one medically induced) — procedures medically similar to abortion.
Dr. John Thorp, Jr., an expert witness for the defendants, testified that abortion is more dangerous than D & C or hyster-oscopy because there' is increased blood flow during a pregnancy. But one of the plaintiffs’ experts, Dr. Douglas Laube, countered that a pregnant uterus responds better to treatments to stop bleeding, making the risk of the procedures roughly the same. The district judge was entitled to credit Laube’s testimony over Thorp’s, and credit too the studies placed in evidence that showed how rare major complications of both hysteroscopy and second-trimester surgical abortion are. See Morris Wort-man et al., “Operative Hysteroscopy in an Office-Based Surgical Setting: Review of Patient Safety and Satisfaction in 414 Cases,” 20 J. Minimally Invasive Gynecology 56 (2013); T.C. van Kerkvoorde et al., “Longterm Complications of Office Hysteroscopy: Analysis of 1028 Cases,” 19 id. 494 (2012); Frick et al., supra.
Dr. Thorp acknowledged, moreover, that admitting privileges are no more important for abortions than for other outpatient procedures. Yet Wisconsin appears to be indifferent to complications of any other outpatient procedures, even when they are far more likely to produce complications than abortions are. For example, the rate of complications resulting in hospitalization from colonoscopies done for screening purposes is four times the rate of complications requiring hospitalization from first-trimester abortions. See Cynthia W. Ko et al., “Serious Complications Within 30 Days of Screening and Surveillance Colo-noscopy Are Uncommon,” 8 Clinical Gastroenterology & Hepatology 166, 171-72 (2010). Operative colonoscopy has an even higher rate of major complications, making it riskier than even second-trimester abortions. See Jerome D. Waye et al., “Colo- *915 noscopy: A Prospective Report of Complications,” 15 J. Clinical Gastroenterology 347 (1992). It is conceivable that because of widespread disapproval of abortion, abortions and their complications may be underreported — some women who experience them and are hospitalized may tell the hospital staff that the complications are from a miscarriage. But there is no evidence of significant or widespread un-derreporting.
The defendants argue that obtaining admitting privileges operates as a kind of Good Housekeeping Seal of Approval for a doctor. True; but obtaining the seal does not require that the hospital in which the doctor obtains the privileges be within 30 miles of his clinic. See, e.g., Women’s Health Center of West County, Inc. v. Webster, 871 F.2d 1377, 1378-81 (8th Cir.1989). Several abortion doctors in Wisconsin who lack admitting privileges at hospitals within the prescribed radius have them — their Good Housekeeping Seals of Approval — at more distant hospitals from their clinic yet are not excused by the statute from having to obtain the identical privileges from a hospital within the 30-mile radius.
The defendants argue that admitting privileges improve continuity of care. But nothing in the statute requires an abortion doctor who has admitting privileges to care for a patient who has complications from an abortion. He doesn’t have to accompany her to the hospital, treat her there, visit her, call her, etc. The statute also does not distinguish between surgical and medical abortions. The latter term refers to an abortion induced by pills given to the patient by her doctor: she takes one pill in the clinic, goes home, and takes an additional pill or pills one or two days later to complete the procedure. Her home may be far from any hospital that is within 30 miles of her doctor’s clinic, but close to a hospital farther from the clinic. If she calls an ambulance the paramedics are likely to take her to the nearest hospital' — - a hospital at which her abortion doctor is unlikely to have admitting privileges. Likewise in the case of surgical abortions when complications occur not at the clinic during or immediately after the abortion but after the patient has returned home. Because of distance, she may lack ready access to hospitals near the clinic at which the abortion was performed. She may live near a hospital, but not a hospital at which the doctor who performed her abortion has admitting privileges.
We can imagine an argument that what Wisconsin did in this case was to make the regulation of the treatment of abortion complications simply the first step on the path to a regulation of all potentially serious complications. But the defendants have not argued this; nor is it plausible that the state would begin such an effort with a procedure that has a very low rate of serious complications. The statute has been on the books for more than two years, yet there is no indication that the legislature has given any consideration to requiring admitting privileges for any doctors other than abortion providers.
The district judge had remarked in granting the preliminary injunction that while he would “await trial on the issue, ... the complete absence of an admitting privileges requirement for [other] clinical [i.e., outpatient] procedures including for those with greater risk [than abortion] is certainly evidence that [the] Wisconsin Legislature’s only purpose in its enactment was to restrict the availability of safe, legal abortion in this State, particularly given the lack of any demonstrable medical benefit for its requirement either presented to the Legislature or [to] this court.” Planned Parenthood of Wisconsin, Inc. v. Van Hollen, No. 13-cv-465-wmc, 2013 WL *916 3989238, at *10 n. 26 (W.D.Wis. Aug. 2, 2013) (emphasis in original). Confirmatory evidence is the statutory two-day deadline for obtaining admitting privileges in order to be allowed to perform abortions, though that deadline is of course no longer operable. And we can’t forbear to mention the weird private civil remedy for violations: The father, or a grandparent, of the “aborted unborn child” is entitled to obtain damages, including for emotional and psychological distress, if the abortion was performed by a doctor who lacked admitting privileges. Wis. Stat. § 253.095(4)(a). Were the law aimed at protecting the mother’s health, as the state contends, a violation of the law could harm the fetus’s father or grandparent only if the mother were injured physically or psychologically as a result of her abortion doctor’s lacking the required admitting privileges. But the statute requires no proof of any injury of any kind to the mother to entitle the father or grandparent to damages upon proof of a violation of the statute. Wis. Stat. § 253.095(4).
Until and unless Roe v. Wade is overruled by the Supreme Court, a statute likely to restrict access to abortion with no offsetting medical benefit cannot be held to be within the enacting state’s constitutional authority. The courts have “an independent constitutional duty to review [a legislature’s] factual findings where constitutional rights are at stake.” Gonzales v. Carhart, 550 U.S. 124, 163-65, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007). The Wisconsin statute does not “further[] the legitimate interest” of the state in advancing women’s health, and it was not “reasonable for [the legislature] to think” that it would. Id. at 146, 160, 127 S.Ct. 1610.
Were it not for the injunctions issued by the district court (and the temporary restraining order that preceded them), the statute would have substantially curtailed the availability of abortion in Wisconsin, without conferring an offsetting benefit (or indeed any benefit) on women’s health. Virtually all abortions in Wisconsin are performed at the four abortion clinics (the three Planned Parenthood clinics and the AMS clinic); no other clinics perform abortions, and hospitals perform only a small fraction of the abortions performed in the state. With the preliminary and now the permanent injunction having lifted the deadline for obtaining admitting privileges, doctors at the three Planned Parenthood abortion clinics (Milwaukee, Madison, and Appleton) have been able to obtain admitting privileges at nearby hospitals. But the' two doctors at the fourth clinic, AMS, have been unable to obtain such privileges at any hospital even though 17 hospitals are within a 30-mile radius of the clinic.
Not that its doctors haven’t tried to obtain the privileges. The district court found credible their testimony that the chances of their being granted admitting privileges are “slim to none.” The reason is that almost all of their practice consists of performing abortions and they therefore lack recent experience in performing inpatient medical procedures for which hospitals would grant admitting privileges. Nor is any of their clinical practice peer reviewed, which hospitals also make a condition of granting admitting privileges. One of the doctors couldn’t even obtain an application for admitting privileges at Aurora-Sinai Hospital, because he couldn’t show that he’d “treated patients in a hospital or appropriate outpatient setting in which the Practitioner’s care was subject to evaluation through peer review acceptable to the Metro Credentials Committee, in the previous twelve (12) months.” Froedtert Hospital likewise rejected his application, because he provided neither “evidence of recent (with-in the past 2 *917 years) inpatient activity” nor “an evaluation of [his] ability to provide care for patients in the inpatient environment.” The other AMS doctor was also rejected by Aurora-Sinai, which told him he was ineligible to obtain Ml admitting privileges because he would be unable to admit the required minimum of 20 patients per year, and that he could not obtain courtesy privileges (which differ from Ml privileges in allowing a doctor to admit only a very few patients) without already having staff privileges at another hospital. Another hospital, St. Joseph’s Community Hospital of West Bend, requires applicants for obstetrics/gynecology admitting privileges to have delivered 100 babies in the previous two years, by which of course they mean live babies; and delivering live babies is not what abortion doctors do.
Moreover, all the hospitals require, as a condition to obtaining admitting privileges, demonstrated competence in performing the particular procedures that the doctor seeks to perform at the hospital on patients that he admits. Although a defense expert from Columbia St. Mary’s Hospital testified that the hospital would evaluate a physician’s quality without requiring a record of inpatient care, he acknowledged that a doctor seeking, admitting privileges would have to demonstrate competence to perform the specific procedures for which he sought the privileges. Hospitals are entitled to demand' proof that doctors seeking to work at the hospital be able to perform the procedures that they want to perform there. But to condition the grant of admitting privileges on being qualified to perform procedures that AMS’s abortion doctors never perform is to bar them from performing abortions.
So, as the district judge found, if the statute is valid neither of the AMS doctors will be allowed to perform any abortions, and the clinic will have to shut down unless it can recruit and retain other doctors — doctors who have or can readily obtain admitting privileges within the prescribed radius of the clinic. But it is difficult to hire such doctors, not only because it’s difficult for abortion doctors to obtain admitting privileges (especially within a prescribed radius of the clinic) but also because of the vilification, threats, and sometimes violence directed against abortion clinics and their personnel in states, such as Wisconsin, in which there is intense opposition to abortion.
AMS is particularly vulnerable because, as we’re about to see, it’s the only abortion clinic in the state that performs late-term abortions. But were the statute to be upheld, Planned Parenthood’s clinics could also face having to close or significantly reduce the abortions they perform, within a few years, despite currently having doctors with admitting privileges. Hospitals generally require that a doctor, to maintain his admitting privileges, be responsible for admitting a specified minimum number of patients annually. Because of the very low rate of complications from abortions that require hospitalization, the required quotas may be difficult to meet.
One might think (setting that last point to one side for the moment) that the Planned Parenthood abortion clinic in Mil-, waukee would have adequate capacity to serve all women in the Milwaukee area who decide to have an abortion, in which event the demise of AMS would be no big deal. Not so. Of some 6462 abortions performed in Wisconsin in 2013 (the latest year for which there are complete figures), 5800 were performed in abortion clinics in the state (see Wisconsin Department of Health Services, “Reported Induced Abortions in Wisconsin, 2013,” Aug. 2014, www. dhs.wisconsin.gov/publications/p4/p45360-13.pdf), and 2500 of those were performed by AMS. (Presumably the 662 abortions *918 not performed in abortion clinics were performed in hospitals.)
The Planned Parenthood clinic in Milwaukee would have to expand staff and facilities to accommodate such an influx (the Planned Parenthood clinic in Appleton is more than a hundred miles from Milwaukee, and the Madison clinic eighty miles, distances that would impose hardship on some women who live close to Milwaukee and are seeking abortions), and this would be costly and could even be impossible given the difficulty of recruiting abortion doctors. The district judge accepted uncontradicted testimony -that Planned Parenthood could not absorb the additional demand for abortions, and the result (of demand exceeding supply) would be an 8 to -10 week delay in obtaining an abortion. Some women would have to forgo first-trimester abortions and instead get second-trimester ones, which are more expensive and present greater health risks. Other women would be unable to obtain any abortion, because the delay would push them past the 18.6-weeks-LMP (“last menstrual period,” which is likely to precede conception by a couple of weeks) deadline for the Planned Parenthood clinics’ willingness to perform abortions. Only AMS will perform abortions beyond that limit (up to 22 and occasionally 24 weeks of pregnancy). Women seeking lawful abortions that late in their pregnancy, either because of the waiting list or because they hadn’t realized their need for an abortion sooner, would be unable to obtain abortions in Wisconsin.
AMS performs, about 250 late-term abortions each year (and that’s without the additional patients who would be pushed past 18.6 weeks by an 8 to 10 week waiting list). And, to repeat, it’s the only abortion clinic in Wisconsin that performs such abortions. Although the state points out that these late-term abortions currently constitute fewer than one percent of the abortions performed in the state, “the analysis does not end with the one percent of women upon whom the statute operates; it begins there.” Planned Parenthood of Southeastern Pennsylvania v. Casey, supra, 505 U.S. at 894, 112 S.Ct. 2791 (plurality opinion). For the longer the waiting list for an abortion, the more women who want to have early-term abortions will perforce end up having late-term ones, which are more dangerous.
No problem, argues the state, since Chicago is only 90 miles from Milwaukee, and there is at least one clinic in Chicago that will perform abortions after 19 weeks. The logic of the state’s position is that it could forbid both abortion clinics in Milwaukee to perform abortions on anyone living in that city, given that the Chicago clinics are only about 90 miles away (and one clinic, in the northern suburbs of Chicago, is only 74 miles from Milwaukee’s city center).
The state’s position is untenable. As we said in Ezell v. City of Chicago, 651 F.3d 684, 697 (7th Cir.2011), the proposition that
the harm to a constitutional right [can be] measured by the extent to which it can be exercised in another jurisdiction ... [is] a profoundly mistaken assumption. In the First Amendment context, the Supreme Court long ago made it clear that “one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.” Schad v. Borough of Mt. Ephraim, 452 U.S. 61, 76-77, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981), quoting Schneider v. New Jersey, 308 U.S. 147, 163, 60 S.Ct. 146, 84 L.Ed. 155 (1939). The same principle applies here. It’s hard to imagine anyone suggesting that Chicago may prohibit the exercise of a free- *919 speech or religious-liberty right within its borders on the ground that those rights may be freely enjoyed in the suburbs.
Or as the Supreme Court put it in Missouri ex rel. Gaines v. Canada, 805 U;S. 837, 350, 59 S.Ct. 232, 83 L.Ed. 208 (1938),
the obligation of the State to give the protection of equal laws can be performed only where its laws operate, that is, within its own jurisdiction. It is there that the equality of legal right must be maintained. That obligation is imposed by the Constitution upon the States severally as governmental entities&emdash;each responsible for its own laws establishing the rights and duties of persons within its borders. It is an obligation the burden of which cannot be cast by one State upon another, and no State can be.excused from performance by what another State may do or fail to do.
See also Jackson Women’s Health Organization v. Currier, supra, 760 F.3d at 457-58. It’s true that we said in A Woman’s Choice-East Side Women’s Clinic v. Newman, 305 F.3d 684, 688 (7th Cir.2002), that the undue burden standard should be applied “to the nation as a whole, rather than one state at a time.” But the statement, though in seeming tension with Gaines and Jackson, has nothing to do with looking at the availability of abortion services across state lines. Instead the court was worried that district judges in different states might reach different conclusions about the constitutionality of nearly identical statutes.
It’s also true, though according to the cases just quoted irrelevant, that a 90-mile trip is no big deal for persons who own a car or can afford an Amtrak or Greyhound ticket. But more than 50 percent of Wisconsin women seeking abortions have incomes below the federal poverty line and many of them live in Milwaukee (and some north or west of that city and so even farther away from Chicago). For them a round trip to Chicago, and finding a place to stay overnight in Chicago should they not feel up to an immediate return to Wisconsin after the abortion, may be prohibitively expensive. The State of Wisconsin is not offering to pick up the tab, or any part of it. These women may also be unable to take the time required for the round trip away from their work or the care of their children. The evidence at trial, credited by the district judge, was that 18 to 24 percent of women who would need to travel to Chicago or the surround-' ing area for an abortion would be unable to make the trip.
An abortion-restricting statute sought to be justified on medical grounds requires not only reason to believe (here lacking, as we have seen) that the medical grounds are valid, but also reason to believe that the restrictions are not disproportionate, in their effect on the right to an abortion, to the medical benefits that the restrictions are believed to confer and so do not impose an “undue burden” on women seeking abortions. See Planned Parenthood of Southeastern Pennsylvania v. Casey, supra, 505 U.S. at 874, 877, 900-01, 112 S.Ct. 2791 (plurality opinion); Gonzales v. Carhart, supra, 550 U.S. at 146, 157-58, 127 S.Ct. 1610; Stenberg v. Carhart, 530 U.S. 914, 930, 938, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000). To determine whether the burden imposed by the statute is “undue” (excessive), the court must “weigh the burdens against the state’s justification, asking whether and to what extent the challenged regulation actually advances the state’s interests. If a burden significantly exceeds what is necessary to advance the state’s interests, it is ‘undue,’ ” Planned Parenthood Arizona, Inc. v. *920 Humble, 753 F.3d 905, 913 (9th Cir.2014), which is to say unconstitutional. The feebler the medical grounds (in this case, they are nonexistent), the likelier is the burden on the right to abortion to be disproportionate to the benefits and therefore excessive.
There are those who would criminalize all abortions, thus terminating the constitutional right asserted in Roe and Casey and a multitude of other decisions. And there are those who would criminalize all abortions except ones that terminate a pregnancy caused by rape or are necessary to protect the life or (in some versions) the health of the pregnant woman. But what makes no sense is to abridge the constitutional right to an abortion on the basis of spurious contentions regarding women’s health — and .the abridgment challenged in this case would actually endanger women’s health. It would do that by reducing the number of abortion doctors in Wisconsin, thereby increasing the waiting time for obtaining an abortion, and that increase would in turn compel some women to defer abortion to the second trimester of their pregnancy — which the studies we cited earlier find to be riskier than a first-trimester abortion. For abortions performed in the first trimester the rate of major complications is 0.05-0.06 percent (that is, between five one-hundredths of 1 percent and six one-hundredths of 1 percent). It is 1.3 percent for second-trimester abortions — between 22 and 26 times higher.
The burden on abortion imposed by the Wisconsin statute is greater than in the cases in which the Fourth and Fifth Circuits have upheld similar admitting privileges requirements, because the plaintiffs in those cases failed to satisfy the courts that the challenged statutes would lead to a substantial decline in the availability of abortion. In both Planned Parenthood of Greater Texas Surgical Health Services v. Abbott, supra, 748 F.3d at 597-98, and Greenville Women’s Clinic v. Bryant, 222 F.3d 157, 162, 170 (4th Cir.2000), the courts decided that the evidence compelled only a conclusion that one clinic in each state would close as a result of the statute and each of those two clinics performed only a small proportion of its state’s abortions.
The Fifth Circuit also upheld another requirement in the same statute — that abortion clinics must meet the standards for ambulatory surgical centers — despite the evidence that as a result of this requirement only eight clinics would survive out of the more than forty in existence when the statute was enacted. Whole Woman’s Health v. Cole, 790 F.3d 563, 578 (5th Cir.2015), cert. granted, — U.S. -, 136 S.Ct. 499, 193 L.Ed.3d 364, 2015 WL 5176368 (Nov. 13, 2015). The court remarked the absence of evidence that the remaining clinics could not expand their capacity to compensate for the closing of more than three-fourths of them, id. at 590, although one wouldn’t think it necessary to parade evidence that the remaining clinics would find, it extremely difficult to quadruple their capacity to provide abortions, which would require, in the face of fierce opposition to abortion clinics and the difficulty of relocating abortion doctors from the closed clinics, extensive physical enlargement, to house additional patients and doctors.
A great many Americans, including a number of judges, legislators, governors, and civil servants, are passionately opposed to abortion — as they are entitled to be. But persons who have a sophisticated understanding of the law and of the Supreme Court know that convincing the Court to overrule Roe v. Wade and Planned Parenthood of Southeastern Pennsylvania v. Casey is a steep uphill *921 fight, and so some of them proceed indirectly, seeking to discourage abortions by making it more difficult for women to obtain them. They may do this in the name of protecting the health of women who have abortions, yet as in this case the specific measures they support may do little or nothing for health, but rather strew impediments to abortion. This is true of the Texas requirement, upheld by the Fifth Circuit in the Whole Woman’s ease now before the Supreme Court, that abortion clinics meet the standards for ambulatory surgical centers — a requirement that if upheld will permit only 8 of Texas’s abortion clinics to remain open, out of more than 40 that existed when the law was passed. And comparably in our case the requirement of admitting privileges cannot be taken seriously as a measure to improve women’s health because the transfer agreements that abortion clinics make with hospitals, plus the ability to summon an ambulance by a phone call, assure the access of such women to a nearby hospital in the event of a medical emergency.
Opponents of abortion reveal their true objectives when they procure legislation limited to a medical procedure — abortion— that rarely produces a medical emergency. A number of other medical procedures are far more dangerous to the patient than abortion, yet their providers are not required to obtain admitting privileges anywhere, let alone within 30 miles of where the procedure is performed. Nor is it likely to have been an accident that the Wisconsin legislature, by making its law requiring admitting privileges effective immediately, would have prevented most of the abortion doctors in the state from performing any abortions for months (for it usually takes months to obtain admitting privileges) had the district court not issued a temporary restraining order followed immediately by a preliminary injunction.
In Planned Parenthood of Greater Texas the court excoriated our opinion upholding the preliminary injunction in the present case, on the ground that we had insisted on evidence that requiring abortion doctors to have admitting privileges would improve women’s health. 748 F.3d at 596. The Fifth Circuit said that the “first step in the analysis of an abortion regulation ... is rational basis review, not empirical basis review.” Id. (emphases in original). Indeed it said “there is ‘never a role for evidentiary proceedings’ under rational basis review.” Id. We take that to be a reference to the motive for “rational basis” review of state laws — namely a reluctance by the federal judiciary to invalidate state laws that even if difficult to defend or explain by reference to sound public policy do not cause harm serious enough to be classified as depriving persons of life, liberty, or property, however broadly those terms are understood.
But a statute that curtails the constitutional right to an abortion, such as the Wisconsin and Texas statutes, cannot survive challenge without evidence that the curtailment is justifiable by reference to the benefits conferred by the statute. The statute may not be irrational, yet may still impose an undue burden — a burden excessive in relation to the aims of the statute and the benefits likely to be conferred by it — and if so it is unconstitutional.
The evidence of benefits that was presented to the Texas legislature and discussed by the Fifth Circuit was weak; in our case it’s nonexistent. The principal witness for the State of Wisconsin, Dr. Thorp, mentioned earlier, testified that the death rate for women who undergo abortions is the same as for other pregnant women. But he could not substantiate that proposition and admitted that both rates are very low. His expert report states that there are “increased risks of *922 death for women electing [abortion] compared to childbirth,” but the studies he cited measured long-term mortality rates rather than death resulting from an abortion, and also failed to control for socioeconomic status, marital status, or a variety of other factors relevant to longevity. See David Reardon & Priscilla Coleman, “Short and Long Term Mortality Rates Associated with First Pregnancy Outcome: Population Register Based Study for Denmark 1980-2004,” 18 Medical Science Monitor PH71, PH75 (2012); Coleman et al., “Reproductive History Patterns and Long-Term Mortality Rates: A Danish, Population-Based Record Linkage Study,” 23 European J. Public Health 569, 569, 573 (2012). In contrast, the plaintiffs’ expert Dr. Laube tendered a more apt study which concluded that the risk of death associated with childbirth is 14 times higher than that associated with abortion. See Elizabeth G. Raymond & David A. Grimes, “The Comparative Safety of Legal Induced Abortion and Childbirth in the United States,” 119 Obstetrics & Gynecology 215 (Feb.2012).
Dr. Thorp acknowledged that the number of abortion providers is declining, but attributed this (again without substantiation) not to harassment but to our society’s “progressing in its recognition of what constitutes human life.” And he agreed as we noted earlier that admitting privileges are no more necessary for abortion than for other outpatient surgical procedures. Neither Thorp nor any other witness for the defendants was able to cite a case in which a woman who had a complication from an abortion wasn’t properly treated for it because her abortion doctor lacked admitting privileges. The evidence was heavily weighted against the defendants. We do not agree with the Fifth Circuit that evidence is irrelevant in a constitutional case concerning abortion.
The state insists that the plaintiffs’ medical expert and the neutral expert agreed with it that admitting privileges would be a good thing for abortion doctors to have. But a fair interpretation of their testimony is that a doctor’s admitting privileges are of value to a patient because they suggest that the hospital that has granted them thinks well of the doctor and because he may be able to expedite the admission of a patient who needs hospital care to the hospital in which the doctor has those privileges. These witnesses did not testify that an abortion doctor who lacks admitting privileges is a danger to his patients. The neutral expert, Dr. Bulun, said that privileges could have advantages, but he was comparing a doctor with privileges to one without privileges; he was not asked whether a shortage of abortion doctors, though such abortion doctors as there were all had privileges, would be preferable to there being enough abortion doctors but not all with admitting privileges. He added that “if there’s a well-established procedure for a transfer agreement, in my mind that would be the most important factor to ensure good quality of care.” There is no evidence that transfer agreements provide inferior protection to the health of women undergoing abortion compared to admitting privileges. When the transfer agreements and the availability of emergency-room care and the rarity of complications of abortion that require hospitalization are compared to the impact this statute would have on access to abortion in Wisconsin, it is apparent that the defendants have failed to make a dent in the district court’s opinion granting the permanent injunction sought by the plaintiffs.
Affirmed