In the

# United States Court of Appeals
## For the Seventh Circuit

No. 17-2428

PLANNED PARENTHOOD OF INDIANA AND KENTUCKY, INC.,

*Plaintiff-Appellee,*

*v.*

JEROME M. ADAMS, Commissioner, Indiana
State Department of Health, *et al.,*

*Defendants-Appellants.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:17-CV-01636-SEB-DML — **Sarah Evans Barker**, *Judge.*

ARGUED JANUARY 5, 2018 — DECIDED AUGUST 27, 2019

Before KANNE, ROVNER, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Consistent with *Bellotti v. Baird,*
443 U.S. 622 (1979), Indiana statutes have long provided a fast
and confidential judicial bypass procedure that is supposed
to allow a small fraction of pregnant, unemancipated minors
seeking abortions to obtain them without the consent of or no-
tice to their parents, guardians, or custodians. In 2017, Indiana
added a parental notification requirement to the judicial

bypass statute. Before the law took effect, plaintiff Planned
Parenthood of Indiana and Kentucky, Inc. sued to enjoin its
enforcement. In a careful opinion, the district court issued a
preliminary injunction against enforcement of the new law's
notice requirements. *Planned Parenthood of Indiana & Kentucky,
Inc. v. Commissioner*, 258 F. Supp. 3d 929, 956 (S.D. Ind. 2017).
The defendant state officials have appealed a portion of the
preliminary injunction. In light of the lopsided factual record,
the deferential standard of review, and the preliminary status
of the findings of fact and conclusions of law, we affirm.

I.   *Legislative Changes*

As a general rule, Indiana prohibits physicians from per-
forming abortions for unemancipated minors without the
written consent of the minor's parent, legal guardian, or cus-
todian. Ind. Code § 16-34-2-4(a). The law provides an excep-
tion, however, so that a minor who objects to the consent re-
quirement or whose parent, guardian, or custodian refuses to
consent may petition a juvenile court for a waiver of the con-
sent requirement. Ind. Code § 16-34-2-4(b). Known as a judi-
cial bypass, this procedure permits the minor to obtain an
abortion without parental consent if the court finds either that
she is mature enough to make the abortion decision inde-
pendently or that an abortion is in her best interests. Ind. Code
§ 16-34-2-4(e). *Bellotti* requires this exception as a matter of
federal constitutional law. 443 U.S. at 643–44 (opinion of Pow-
ell, J.); accord, *Planned Parenthood of Southeastern Pennsylvania
v. Casey*, 505 U.S. 833, 899 (1992). Bypass is supposed to be fast
and confidential. *Bellotti*, 443 U.S. at 644 (bypass proceeding
and any appeals must "be completed with anonymity and
sufficient expedition to provide an effective opportunity for
an abortion to be obtained").

In 2017, the Indiana General Assembly enacted Public Law 173-2017, also known as Senate Enrolled Act 404, which amended the parental consent and judicial bypass statutes in several ways. This appeal focuses on one new requirement for the judicial bypass process. Even if a judge concludes that a parent need not consent to the abortion, either because the unemancipated minor is mature enough to make her own decision or because the abortion is in her best interests, and even though the bypass process is supposed to be confidential per *Bellotti*, parents still must be given prior notice of the planned abortion unless the judge also finds such notice is not in the minor's "best interests." Ind. Code § 16-34-2-4(d). The young woman's attorney "shall serve the notice required by this subsection by certified mail or by personal service." *Id.* A bypass court "shall waive the requirement of parental notification under subsection (d) if the court finds that obtaining an abortion without parental notification is in the best interests of the unemancipated pregnant minor." Ind. Code § 16-34-2-4(e). That difference in language is important. Unlike the judicial bypass of the parental consent requirement, which may be based on either maturity or best interests, judicial bypass of notice may be based only on "best interests."[1]

---

[1] These changes make Indiana something of an outlier. Only two states, Oklahoma and Utah, have parental notice statutes that appear to be more restrictive by not including any form of judicial bypass. See Okla. Stat. Ann. tit. 63, §§ 1-744 to 1-744.6; Utah Code Ann. § 76-7-304. The Supreme Court upheld the Utah statute, but its decision does not control here because that plaintiff "made no claim or showing as to her maturity or as to her relations with her parents." *H.L. v. Matheson*, 450 U.S. 398, 407 (1981); see also *id*. at 415–16 (Powell, J., concurring) (explaining that lack of detail about individual plaintiff's situation had been deliberate choice consistent with seeking broad judicial remedy).

Out of the usual sequence for a judicial opinion, we ad-
dress here one interpretive issue about the new notice require-
ment. We disagree with Planned Parenthood's argument that
the statute permits notice to parents even if the bypass court
refuses to allow the pregnant minor to proceed without her
parents' consent. The statute requires notice to parents after a
bypass hearing but "before the abortion is performed," Ind.
Code § 16-34-2-4(d). We agree with the State that the require-
ment to serve notice is triggered only if the judge authorizes
an abortion. See *Zbaraz v. Madigan*, 572 F.3d 370, 383 (7th Cir.
2009) ("Where fairly possible, courts should construe a statute
to avoid a danger of unconstitutionality."), quoting *Ohio v.
Akron Center for Reproductive Health*, 497 U.S. 502, 514 (1990).
Bypass proceedings and appeals are sealed. Ind. Code § 16-
34-2-4(h). The new statute does not provide a legal mecha-
nism that would allow a judge to order notice to parents of a
minor's unsuccessful attempt to seek bypass.[2]

In addition to the notice requirement, Public Law 173-2017
changed the consent and judicial bypass statutes in other
ways. Indiana already required parents to show their consent
in writing, but the new law raised that requirement. It re-
quired a physician performing an abortion for a minor not
only to obtain written parental consent but also to obtain

---

[2] The new, challenged Indiana notice requirement opens the door,
however, for the minor's *parents* to choose to disclose her pregnancy, her
abortion, and/or the judicial bypass process to anyone they like and for
any purpose they like. Cf. *Planned Parenthood v. Casey*, 505 U.S. at 893 (not-
ing that many women who feared notifying their spouses of planned abor-
tions may fear "devastating forms of psychological abuse," including "the
withdrawal of financial support, or the disclosure of the abortion to family
and friends," which "may act as even more of a deterrent to notification
than the possibility of physical violence").

government-issued proof of identification from the consenting parent, as well as "some evidence, which may include identification or other written documentation that provides an articulable basis for a reasonably prudent person to believe that the person is the parent or legal guardian or custodian of the unemancipated pregnant minor." Ind. Code § 16-34-2-4(a)(3). The new law also required a physician who obtains parental consent to execute and save an affidavit certifying that "a reasonable person under similar circumstances would rely on the information provided by the unemancipated pregnant minor and the unemancipated pregnant minor's parent or legal guardian or custodian as sufficient evidence of identity and relationship." Ind. Code § 16-34-2-4(k)(2).

The new law also added a section imposing civil liability on anyone who "knowingly or intentionally aid[s] or assist[s] an unemancipated pregnant minor in obtaining an abortion without the consent required" by the consent statute. Ind. Code § 16-34-2-4.2(c). In the district court, the parties agreed that this provision would prohibit Planned Parenthood and its physicians from providing an unemancipated minor information regarding out-of-state abortion services which ostensibly would not require parental consent or notice. *Planned Parenthood*, 258 F. Supp. 3d at 934. The district court's preliminary injunction enjoined enforcement of all of those changes. *Id.* at 956. In this appeal, Indiana has not challenged those portions of the injunction, so we do not discuss them further.

Returning to the disputed new parental notice requirement in the judicial bypass procedure, it is relevant that Indiana law authorizes both criminal penalties and professional licensing sanctions against abortion providers and their employees for violating portions of Indiana's abortion law. E.g.,

Ind. Code § 16-34-2-7(b) (physician who intentionally or knowingly performs abortion in violation of Ind. Code § 16-34-2-4 commits Class A misdemeanor); Ind. Code § 25-1-9-4(a)(2)-(3) (Indiana Medical Licensing Board may discipline physicians who commit crimes); 410 Ind. Admin. Code § 26-2-8(b)(2) (abortion facilities, like some Planned Parenthood facilities, are subject to license revocation or discipline for "permitting, aiding, or abetting the commission of any illegal act in an abortion clinic").

Before the new law took effect, Planned Parenthood brought this lawsuit against several defendants in their official capacities: the Commissioner of the Indiana State Department of Health, the prosecutors of Marion, Lake, Monroe, and Tippecanoe Counties, the members of the Indiana Medical Licensing Board, and the judge of the Juvenile Division of the Marion Superior Court (collectively, the "State"). The State appeals the portion of the preliminary injunction against the new parental notice requirement.

II. *The Evidence and Likely Effects*

In support of its motion for preliminary injunction, Planned Parenthood submitted affidavits from seven witnesses to show the likely effects of the statute. The State chose to introduce no evidence in response. The State argued that it was "self-evident" that it had met its burden to justify the law with a legitimate state interest. The State did not challenge the reliability or credibility of Planned Parenthood's evidence. That lopsided factual record indicates that, for the small group of minors affected by this law, requiring parental notice is likely a "deal breaker" for a significant fraction. Smith Decl. ¶ 20. Our summary of the evidence draws heavily from Judge Barker's thorough opinion.

Planned Parenthood is a not-for-profit corporation that operates multiple Indiana health centers. Beeley Decl. ¶ 3. Those centers provide reproductive health services and comprehensive sexuality education to thousands of women and men, including adults and teenagers. *Id.* Consistent with Indiana law, Planned Parenthood physicians provide abortions to minors at the four Planned Parenthood facilities in Indiana that offer abortion services. Beeley Decl. ¶¶ 4–5, 8. The vast majority of these minors obtain consent from their parents, guardians, or custodians. In fiscal year 2015 (the most recent data in the record), over 96 percent had obtained consent; fewer than four percent had obtained a judicial bypass. Beeley Decl. ¶¶ 9, 19. That amounts on average to about ten judicial-bypass abortions per year by Planned Parenthood. See Smith Decl. ¶ 9.

Planned Parenthood counsels minors to discuss their desire for an abortion with a parent. Beeley Decl. ¶ 20. Some minors tell Planned Parenthood staff that they do not want to, or feel they cannot, inform their parents that they are pregnant and wish to obtain an abortion. *Id.*, ¶¶ 20–21. In that case, Planned Parenthood gives the minor the telephone number of the bypass coordinator—a person who does not work for Planned Parenthood and who maintains a list of attorneys who can represent a young woman in a judicial bypass proceeding. Beeley Decl. ¶ 24; Smith Decl. ¶¶ 5- 6. Planned Parenthood does not sponsor the bypass coordinator's efforts. Smith Decl. ¶ 6.

Over a six-year period, between October 2011 and September 2017, approximately 60 minors contacted Indiana's bypass coordinator. Smith Decl. ¶ 9. Most were seventeen years old. *Id*. Usually, the young women interested in pursuing

judicial bypass have not told their parents that they are pregnant and are seeking an abortion. *Id.*, ¶ 14. These young women have expressed various reasons for not telling their parents. Some fear being kicked out of their homes. Others fear being abused or punished, or fear that their parents will try to block an abortion. *Id.*, ¶¶ 15–16; Beeley Decl. ¶ 22; Flood Decl. ¶ 9; Pinto Decl. ¶¶ 14–15; Lucido Decl. ¶¶ 8–12. One young woman was forced to give birth because her mother discovered her pregnancy and blocked her ability to have an abortion. Glynn Decl. ¶ 13.

Other minors express related concerns like injury to their relationships with their parents or parental disappointment. Smith Decl. ¶ 17. Some minors do not know where their parents are and have no legal guardian or custodian who could fulfill the consent requirement. Beeley Decl. ¶ 23; Lucido Decl. ¶ 13. Consistently, the young women express their fear that their parent(s) will discover that they are pregnant and seeking an abortion. Smith Decl. ¶ 18; Glynn Decl. ¶ 12; Lucido Decl. ¶¶ 8–13.

The bypass coordinator currently informs young women that no one involved in the bypass process will notify their parents that they are pregnant or seeking an abortion. Smith Decl. ¶ 18. As the district court found, however, Indiana's new law makes this assurance impossible. 258 F. Supp. 3d at 936–37. The district court also found that bypasses granted to Planned Parenthood's patients "have generally been based on the juvenile court's finding that the minor was sufficiently mature to make the abortion decision independent of her parents," as distinct from the minor's "best interests." *Id.* at 936, citing Beeley Decl. ¶ 26; Flood Decl. ¶ 6; Glynn Decl. ¶ 9.

III. *The District Court's Analysis*

The district court enjoined the enforcement of the parental notification requirement. *Planned Parenthood*, 258 F. Supp. 3d at 956. The court identified the tension in the case law regarding the standard for a pre-enforcement facial challenge of an abortion statute, *id.* at 937–39, and noted that "the severity and character of harm presented by certain abortion restrictions render them vulnerable to pre-enforcement facial challenges." *Id.* at 939. Crediting the uncontradicted affidavits offered by Planned Parenthood, the district court found that "the requirement of providing parental notification before obtaining an abortion carries with it the threat of domestic abuse, intimidation, coercion, and actual physical obstruction." *Id.* The court therefore rejected as "simply incorrect" the State's argument that Planned Parenthood must wait to challenge the law until it has evidence of the law's effect after it goes into effect. *Id.*

On the merits, the district court reviewed the evolution of both Supreme Court and circuit precedent in this challenging area of the law. 258 F. Supp. 3d at 940–46. Following the command of *Planned Parenthood v. Casey* in applying the "undue burden" standard, the district court identified the relevant group of young women as the "group for whom the law is a restriction, not the group for whom the law is irrelevant." *Id.* at 939, quoting 505 U.S. at 894. The court then described that group as young women who face the possibility of interference, obstruction, or abuse as a result of the parental notification requirement. The district court entered a preliminary injunction because the notice requirement was likely to "create an undue burden for a sufficiently large fraction of mature, abortion-seeking minors in Indiana." 258 F. Supp. 3d at 939–

40, citing *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2320 (2016).

IV. *Pre-Enforcement Facial Challenge*

The State argues that the district court erred in issuing the preliminary injunction because a facial challenge requires evidence of a law's effects, and that evidence can be obtained only by allowing a law to go into effect. The State's position derives primarily from language in our decision in *A Woman's Choice-East Side Women's Clinic v. Newman*, where we said that "it is an abuse of discretion for a district judge to issue a pre-enforcement injunction while the effects of the law (and reasons for those effects) are open to debate." 305 F.3d 684, 693 (7th Cir. 2002). Strictly speaking, this passage was dicta in the opinion, which addressed a permanent injunction after discovery and a full trial, not the earlier preliminary injunction, but it was obviously considered dicta.

The State's position overstates the evidence required for a pre-enforcement facial challenge, as shown by a broader look at cases decided before and after *A Woman's Choice*. When we decided *A Woman's Choice*, there was a sharper conflict in Supreme Court precedent on this question. In *United States v. Salerno*, the Supreme Court had said broadly that, outside the First Amendment, a law is facially invalid only where "no set of circumstances exists under which the Act would be valid." 481 U.S. 739, 745 (1987). But *Salerno* was about the Bail Reform Act. In *Casey* and in *Stenberg v. Carhart*, the Court had invalidated two abortion statutes on pre-enforcement facial challenges without even mentioning *Salerno*. See *Casey*, 505 U.S. at 845, 895; *Stenberg*, 530 U.S. 914, 945 (2000).

The State argues that *A Woman's Choice* resolved the tension and that "the applicable test on a pre-enforcement facial challenge to an abortion regulation is whether the law will *incontrovertibly* impose an undue burden." State's Br. at 12. It is difficult to reconcile this rule of thumb with the general standard for preliminary injunctions, which requires the district court to exercise its sound equitable discretion in balancing several factors. See *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008). Also, other decisions by this court, both before and after *A Woman's Choice*, have recognized that the law on this question has not been as clear-cut as the State argues. See, e.g., *Zbaraz v. Madigan*, 572 F.3d at 381 n.6 (noting "some disagreement" over applicability of *Casey*'s "large fraction" test or *Salerno*'s "no set of circumstances" test—because of 2008 Supreme Court decision affirming *Salerno*'s applicability outside abortion context—but upholding parental notice requirement with judicial bypass under either standard); *Karlin v. Foust*, 188 F.3d 446, 483 (7th Cir. 1999) (noting "considerable disagreement" over which standard to apply because *Casey* "appears to have tempered, if not rejected, *Salerno*'s stringent 'no set of circumstances' standard in the abortion context," but assuming applicability of *Casey*'s large fraction test because neither party appealed district court's use of *Casey* test); see also *Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, 738 F.3d 786, 788, 789 (7th Cir. 2013) (affirming injunction against requirement that physicians who perform abortions have admitting privileges at nearby hospital).

The biggest problem for the State's argument is that *A Woman's Choice* was decided before the Supreme Court decided *Whole Woman's Health v. Hellerstedt*, which confirmed that the *Casey* undue burden standard applies to pre-enforcement facial challenges to statutes regulating abortion. 136 S.

Ct. at 2309–10 (identifying *Casey* undue burden standard as applicable test); *id.* at 2314–18 (applying undue burden standard to facial challenge to surgical center requirement statute); *id.* at 2320 (identifying denominator for large-fraction test). In *Whole Woman's Health*, the plaintiffs brought a pre-enforcement facial challenge to a Texas statute requiring that abortion facilities abide by the same minimum facility standards as ambulatory surgical centers. See *id.* at 2300; *id.* at 2301 (noting that petitioners brought suit on April 6, 2014 seeking "an injunction prohibiting enforcement of the surgical-center provision anywhere in Texas"). The Supreme Court applied the undue burden standard and reversed the denial of an injunction, without citing *Salerno*. To support that reversal, the Court relied on pre-enforcement evidence from the district court. E.g., *id.* at 2317.[3]

These applications fit with the Supreme Court's recent acknowledgment that facial challenges may "proceed under a diverse array of constitutional provisions." *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2449 (2015) (collecting cases); see also

---

[3] The briefing in *Whole Woman's Health* supports this approach. In its brief, Texas assumed that *Casey*'s "large fraction" test applied but argued that the Court should apply *Salerno*'s "no set of circumstances" test if the Court addressed the issue. Brief for Respondents at 30 n.10, *Whole Woman's Health*, 136 S. Ct. 2292 (No. 15-274), 2016 WL 344496, at *30 n.10. The Court did not address this argument explicitly but rejected it implicitly, following *Casey*. The dissenting Justices in *Whole Woman's Health* also did not invoke *Salerno*. Another portion of *Whole Woman's Health* challenged a requirement that had been allowed to take effect, that physicians have admitting privileges at nearby hospitals. The evidence showed that after the requirement took effect, it led to closure of about half the facilities providing abortions in Texas and imposed an undue burden on women's right to choose to terminate their pregnancies. 136 S. Ct. at 2312–13.

Richard H. Fallon, Jr., *Fact and Fiction About Facial Challenges*, 99 Calif. L. Rev. 915, 918 (2011) ("Facial challenges also succeed much more frequently than either Supreme Court Justices or most scholarly commentators have recognized.").

V. *Applying the Preliminary Injunction Standard*

To obtain a preliminary injunction, a plaintiff must show a reasonable likelihood of success on the merits, the absence of an adequate remedy at law, and a threat of irreparable harm without the injunction. E.g., *Planned Parenthood of Indiana, Inc. v. Commissioner*, 699 F.3d 962, 972 (7th Cir. 2012). If the plaintiff makes this showing, the court weighs two additional factors: the balance of harms—harm to the plaintiff if the injunction is erroneously denied versus harm to the defendant if the injunction is erroneously granted—and the effect of the injunction on the public interest. *Id.*; accord, *Winter*, 555 U.S. at 24; *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11–12 (7th Cir. 1992). The higher the likelihood of success on the merits, the less decisively the balance of harms needs to tilt in the moving party's favor.

In reviewing a district court's grant of a preliminary injunction, we review factual findings for clear error, legal conclusions *de novo*, and balancing of the equitable factors for abuse of discretion. The abuse of discretion standard means that the district court's weighing of evidence and balancing of the equitable factors receive "substantial deference." *Whitaker v. Kenosha Unified School Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017). That deference is appropriate given the nature of preliminary injunction decisions, which must be based on incomplete information and are subject to further consideration and revision after discovery, more evidence, and a trial.

Motions for preliminary injunctions call upon courts to make judgments despite uncertainties. Uncertainty about a law's application does not necessarily preclude an injunction. We have read *Casey* as calling for consideration of a law's "*likely* effect." E.g., *Karlin*, 188 F.3d at 481 (emphasis added). *Casey* itself spoke in terms of possibilities in striking down a spousal notice law before it took effect. See, e.g., 505 U.S. at 893 ("*may* fear," "*likely* to prevent," "*will* impose"), 895 ("*will* operate") (opinion of the Court) (emphases added).

Our decision in *A Woman's Choice* is not inconsistent with this focus. In *A Woman's Choice*, the state had not appealed the preliminary injunction that preserved the status quo while the parties developed a more complete record. See 305 F.3d at 684. The preliminary injunction had been issued despite the district court's inability "to draw *definitive* conclusions." *A Woman's Choice-East Side Women's Clinic v. Newman*, 904 F. Supp. 1434, 1462 (S.D. Ind. 1995) (emphasis in original). And when we decided the appeal from the *permanent* injunction in that case, we distinguished the record before us from the record in *Casey* on spousal notice, a record showing a rule "facilitating domestic violence or even inviting domestic intimidation." *A Woman's Choice*, 305 F.3d at 692.[4]

A. *Likelihood of Success on the Merits*

We consider first Planned Parenthood's likelihood of success on the merits, and then turn to the other equitable factors

---

[4] As noted above, our opinion in *A Woman's Choice* criticized the unappealed preliminary injunction in that case, see 305 F.3d at 692–93, but on grounds tied to the pre-enforcement challenge issue discussed above, for which *Whole Woman's Health* provides more recent and authoritative guidance from the Supreme Court.

for preliminary injunctive relief. The district court concluded that Planned Parenthood demonstrated a likelihood of success on the merits because the parental notification requirement appeared highly likely to impose an undue burden for the minors whom it will affect. We agree with the district court's analysis, except that we do not need to decide whether the Supreme Court's requirements for parental consent statutes also apply in full to parental notice statutes.

Planned Parenthood demonstrated a likelihood of success on the merits because Indiana's notice law creates a substantial risk of a practical veto over a mature yet unemancipated minor's right to an abortion. This practical veto appears likely to impose an undue burden for the unemancipated minors who seek to obtain an abortion without parental involvement via the judicial bypass. The burden appears to be undue because the State has made no effort to support with evidence its claimed justifications or to undermine with evidence Planned Parenthood's showing about the likely effects of the law.

In *Whole Woman's Health*, the Supreme Court applied the *Casey* plurality's undue burden standard. 136 S. Ct. at 2309–10. The undue burden standard "is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877 (plurality opinion). In both cases, the Court took a common-sense approach in considering the practical effects of the state regulations. *Whole Woman's Health*, 136 S. Ct. at 2317 ("Courts are free to base their findings on commonsense inferences drawn from the evidence."); *Casey*, 505 U.S. at 892 (opinion of the Court) (noting that district court's findings regarding effect of

spousal notice statute and potential for domestic abuse "reinforce what common sense would suggest").

### 1.  *The Relevant Group for Undue Burden Analysis*

If a statute "will operate as a substantial obstacle" "in a large fraction of the cases in which [it] is relevant," the statute "is an undue burden and therefore invalid." *Casey*, 505 U.S. at 895 (opinion of the Court); accord, *Whole Woman's Health*, 136 S. Ct. at 2320. The analysis starts with those "upon whom the statute operates"—i.e., "the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Casey*, 505 U.S. at 894 (opinion of the Court). For the spousal notice law struck down in *Casey*, that was less than one percent of women seeking abortions. This group serves as the denominator for the relevant fraction *Casey* described. Under *Casey*, a statute that will have the practical effect of giving someone else a veto over a woman's abortion decision is an undue burden. See 505 U.S. at 897 (spousal notice requirement would give husbands of spousal abuse victims "an *effective* veto" that "will often be tantamount to the veto found unconstitutional in *Danforth*") (emphasis added).

*Casey* qualified its holding on spousal notice by saying it was "in no way inconsistent" with the Court's parental notice and consent requirements for minors. 505 U.S. at 895. But here, as in *Casey*, evidence matters. See *id.* at 887–94 (discussing district court's findings and studies of domestic violence). Planned Parenthood's evidence—which the State did not rebut with its own—raises concerns about minors similar to those the *Casey* Court had about the practical veto imposed on some women by spousal notice. *Casey* shows that a practical veto can be an undue burden, whether that practical veto is held by a partner or a parent of a mature minor.

The *Casey* analysis focuses on proportions, not total numbers. See *Van Hollen*, 738 F.3d at 798 ("It is not a matter of the number of women likely to be affected."). Although the record does not indicate the exact number of unemancipated minors who will be affected as they go through the judicial bypass, the number appears to be small. In fiscal year 2015, 96 percent of minors who had abortions at Planned Parenthood facilities in Indiana had their parent or guardian's consent. Beeley Decl. ¶ 9. Just four percent did not have consent. Between October 2011 and September 2017, about 60 young women contacted the bypass coordinator, and only some of them obtained an abortion. Smith Decl. ¶ 9. On average, that is about 10 minors per year.[5]

In the district court, Planned Parenthood argued that the denominator for the *Casey* fraction is unemancipated minors seeking bypasses. These are the young women for whom the law's restriction is relevant. Cf. *Casey*, 505 U.S. at 895 (opinion of the Court) (defining denominator as "married women seeking abortions who do not wish to notify their husbands of their intentions and who do not qualify for one of the statutory exceptions to the notice requirement"). The district court found that the bypasses granted to Planned Parenthood patients "have generally been based on the juvenile court's finding that the minor was sufficiently mature." *Planned Parenthood*, 258 F. Supp. 3d at 936, citing Beeley Decl. ¶ 26. Accordingly, Planned Parenthood argues that the burdensome effects of the new parental notice requirement produce a large

---

[5] In calendar year 2017, 236 minors obtained abortions in Indiana. Indiana State Department of Health, Terminated Pregnancy Report 2017, at 7, available at https://www.in.gov/isdh/files/2017%20Indiana%20Terminated%20Pregnancy%20Report.pdf.

*Casey* fraction because most bypasses have been granted on maturity grounds, which is not a basis for excusing parental notice under the challenged Indiana law. We agree.

On this record, though, the correct numerator and denominator may both actually be even larger. Both numbers include not only young women who could be deemed mature in a judicial bypass of the consent requirement, but also young women who are likely to be deterred from even attempting judicial bypass because of the possibility of parental notice. Indiana has aimed this requirement at the tiny group of minors who could show maturity but could not show that parental notice would not be in their best interests. The evidence in the preliminary injunction record indicates that the statute's effect will be broader because it will prevent some minors from even seeking bypass in the first place. The fear these minors feel at the prospect of the "chance that their parents will have to be informed that they are seeking an abortion … would be a deal breaker." Smith Decl. ¶ 20.

### 2. *The State's Interest in the Notice Requirement*

*Whole Woman's Health* reiterated that *Casey* "requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer," and courts must balance these interests. 136 S. Ct. at 2309. *Whole Woman's Health* shows that courts must consider actual evidence regarding both claimed benefits and claimed burdens of abortion regulations. *Id*. at 2309–10. In that case, for example, Texas argued that its admitting-privileges requirement was intended to provide health benefits in cases with complications. The evidence showed, however, that "there was no significant health-related problem that the new law helped to cure." *Id*. at 2311.

In this case, the State has not yet come forward with evidence showing that there is a problem for the new parental-notice requirement to solve, let alone that the law would reasonably be expected to solve it. See *id.* The State has several substantial interests that can be relevant in this context, if there is reason to think they will be advanced by the new law. E.g., *Casey*, 505 U.S. at 871 (plurality opinion) ("protecting the potentiality of human life," quoting *Roe v. Wade*, 410 U.S. 113, 162 (1973)); *Casey*, 505 U.S. at 872 (plurality opinion) ("expressing a preference for normal childbirth," quoting *Webster v. Reproductive Health Svcs.*, 492 U.S. 490, 511 (1989)); *Planned Parenthood*, 258 F. Supp. 3d at 941 ("protecting children and adolescents, preserving family integrity, and encouraging parental authority"). Against these potential State interests, minors also have constitutional rights that require protection. *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 74 (1976) ("Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional rights."). In the face of evidence of burdensome effects, it is not enough for the State merely to recite its interests and to claim the new law will serve those interests or to say it is only experimenting.

The State's arguments assume that, in raising their children, parents will fulfill the role the Supreme Court has said is constitutional for them to fulfill. We can all hope that that is the reality for the vast majority of young women who face an unexpected pregnancy and that they will turn to their parents for guidance. But the evidence before the district court here illustrates a different and "stark social reality," *Ohio v. Akron Center for Reproductive Health*, 497 U.S. at 537 (Blackmun, J., dissenting), "that there is 'another world out there,'" *id.* at 541,

quoting *Beal v. Doe*, 432 U.S. 438, 463 (1977) (internal quotation marks omitted). For those pregnant minors affected by this Indiana law, the record indicates that in a substantial fraction of cases, the parental notice requirement will likely have the practical effect of giving parents a veto over the abortion decision. That practical effect is an undue burden because it weighs more heavily in the balance than the State's interests. We agree with the district court that the burden of this law on a young woman considering a judicial bypass is greater than the effect of judicial bypass on her parents' authority. *Planned Parenthood*, 258 F. Supp. 3d at 948.

Indiana argues that parents need notice because they need to know about the abortion to be able to care for their daughter's health: "abortion is a facet of medical history that could have implications for future treatment." State's Br. at 22. While that rationale sounds reasonable at first, it is not supported by logic or evidence. As a matter of logic, if we assume this knowledge would help parents care for their daughters later, the State's proposed benefit would not depend on giving parents *prior* notice of an abortion, as the statute requires. Planned Parenthood's evidence shows a serious risk that prior notice, instead of giving parents an opportunity to offer wise counsel, will actually give parents an opportunity to exercise a practical veto, preventing the pregnant minor from actually exercising the constitutional right the juvenile court has allowed her to exercise.

In fact, the State has offered no evidence that any actual benefit is likely or that there is a real problem that the notice requirement would reasonably be expected to solve. *Whole Woman's Health* shows that myths, speculation, and conventional wisdom are not enough to justify restrictions on the

right to abortion. 136 S. Ct. at 2311 ("there was no significant health-related problem that the new law helped to cure"). In applying the undue burden standard, actual evidence is key in weighing both the extent of burdens and the extent of benefits a State offers to justify them. 136 S. Ct. at 2310, citing *Casey*, 505 U.S. at 888–94 (discussing evidence showing spousal notice requirement imposed undue burden on right to terminate pregnancy). In this case, the State offered no evidence to support these proposed benefits, such as how, why, and how often a minor's past abortion is likely to affect her mental health or her future health-care.[6]

---

[6] Without relevant evidence in the record, our dissenting colleague cites studies cited in an amicus brief on appeal and in the concurring opinion in *McCorvey v. Hill*, 385 F.3d 846, 850–51 & n.3 (5th Cir. 2004) (Jones, J., concurring), to assert that a mature minor who has an abortion faces substantial risks to her mental and physical health and would benefit from her parents' support. Post at 45. Because these studies on this controversial subject are not in the record and have not been subject to adversarial testing in litigation, we do not address them in detail. As a general rule, however, data on physical health indicate that "complications from an abortion are both rare and rarely dangerous." *Planned Parenthood of Wisconsin, Inc. v. Schimel*, 806 F.3d 908, 912 (7th Cir. 2015); *id*. at 913 (noting studies finding "that the rate of complications is below 1 percent"); see also *Whole Woman's Health*, 136 S. Ct. at 2311–12 (finding no legitimate state interest in requiring facilities that perform abortions also have hospital admitting privileges because weight of the evidence revealed extremely low rate of abortion-related complications). Regarding mental health issues, the American Psychological Association undertook a comprehensive review of mental health studies of women who had abortions and found serious methodological problems in many published studies finding serious mental health risks. The APA task force found, among other things, that the "best scientific evidence published indicates that among adult women who have an *unplanned pregnancy*, the relative risk of mental health problems is no greater if they have a single elective first-trimester abortion than if they deliver that pregnancy." American Psychological Association, Task

### 3. *The Burden Imposed by the Notice Requirement*

There is of course a formal legal difference between a notice requirement and a consent requirement. The Supreme Court has drawn that distinction on the basis that notice statutes "do not give anyone a veto power over a minor's abortion decision." *Ohio v. Akron Center*, 497 U.S. at 511, citing *H. L. v. Matheson*, 450 U.S. 398, 411 n.17 (1981). Although a notice requirement is not the formal or legal equivalent of a consent requirement, it is equally clear that a notice requirement *can* operate as the *practical* equivalent of a consent requirement. *Casey* recognized just that possibility. That was the basis for striking down the spousal notice requirement. 505 U.S. at 833, 897 ("spousal notice requirement enables the husband to wield an effective veto over his wife's decision"); see also *Planned Parenthood v. Miller*, 63 F.3d 1452, 1459 (8th Cir. 1995) (distinguishing between notice providing an "opportunity" and consent providing a "tool" to obstruct abortion).[7]

---

Force on Mental Health and Abortion at 4 (2008), available at http://www.apa.org/pi/wpo/mental-health-abortion-report.pdf.

Nothing we decide today prevents the State from presenting further evidence on such matters to the district court, where both the State's and Planned Parenthood's evidence can be tested and challenged without the urgent time pressure of a preliminary injunction proceeding. As the Supreme Court outlined in *Whole Woman's Health*, the district court, in "determining the constitutionality of laws regulating abortion procedures," will "place[] considerable weight upon evidence and argument presented in judicial proceedings," rather than deferring to a legislative resolution of "questions of medical uncertainty." 136 S. Ct. at 2310. The district court will then apply "the standard … laid out in *Casey*, which asks courts to consider whether any burden imposed on abortion access is 'undue.'" *Id*.

[7] This reading of Justice Kennedy's opinion for the Court in *Ohio v. Akron Center* is consistent with Justice Kennedy's language in another

The preliminary injunction record here shows the serious potential for the kind of harms identified in *Casey*. For a significant fraction of the small number of unemancipated minors seeking an abortion via judicial bypass, Indiana's notice requirement will likely operate as an undue burden by giving parents a practical veto over the abortion decision. The district court credited the unchallenged testimony of the bypass coordinator and a bypass attorney indicating that young women have chosen not to inform their parents of their pregnancy out of fear of abuse. *Planned Parenthood*, 258 F. Supp. 3d at 946–47, citing Smith Decl. ¶¶ 16–17 and Flood Decl. ¶ 9. The district court also credited unchallenged testimony that pregnancy is a "flashpoint" for abuse. *Id.* at 946, citing Pinto Decl. ¶¶ 14–15.

This evidence parallels the evidence the Supreme Court accepted in *Casey*. 505 U.S. at 889 (opinion of the Court), quoting district court's finding of pregnancy as a "flashpoint for battering and violence within the family," and at 893 (crediting fear of "threats of future violence"). The district court found here that fear of abuse may "prompt pregnant minors to engage in hazardous self-help measures such as attempting to physically and/or chemically induce miscarriage or to entertain thoughts of suicide." *Planned Parenthood*, 258 F. Supp. 3d at 947, citing Pinto Decl. ¶ 16 (one patient attempted to induce miscarriage by convincing boyfriend to stomp on her

___

opinion issued the same day. See *Hodgson v. Minnesota*, 497 U.S. 417, 496 (1990) (Kennedy, J., dissenting in part) ("Unlike parental consent laws, a law requiring parental notice does not give any third party the legal right to make the minor's decision for her, or to prevent her from obtaining an abortion should she choose to have one performed.") (emphasis added).

stomach and push her down stairs; another patient attempted to induce miscarriage by drinking poison).

The district court also found that notice to parents could result in actual obstruction of the abortion itself, in addition to indirect obstruction via withdrawal of financial support. 258 F. Supp. 3d at 946. In *Casey*, the Supreme Court credited similar fears of women who were afraid of notifying their husbands of a pregnancy. 505 U.S. at 893 (discussing fear of "psychological abuse," including "verbal harassment, threats of future violence, the destruction of possessions, physical confinement to the home, the withdrawal of financial support, or the disclosure of the abortion to family and friends"). The district court found here that *Casey*'s concerns are "heightened with regard to unemancipated minors, who typically must rely on their parents … for financial support, housing, and transportation in addition to the many legal incapacities for which the parents must serve as proxy." 258 F. Supp. 3d at 946.

For young women who have these fears, the potential for parental notice is a threat that may deter them from even attempting bypass in the first place. *Id.* at 947, citing Pinto Decl. ¶ 28; see also Smith Decl., ¶ 20; Glynn Decl., ¶ 17; Flood Decl., ¶ 13. For some, as noted, it is a "deal breaker." Smith Decl. ¶ 20. We have recognized a similar deterrent effect before. *Indiana Planned Parenthood Affiliates Ass'n v. Pearson*, 716 F.2d 1127, 1141 (7th Cir. 1983) ("It is hardly speculative to imagine that even some mature minors will be deterred from going to court if they know that their parents will be notified if their petitions are denied, because no minor can be certain that the court will rule in her favor."). This record gives evidentiary weight to the possibilities we identified as concerns about

mandatory notice even before *Bellotti* was decided. See *Wynn v. Carey*, 582 F.2d 1375, 1388 n.24 (7th Cir. 1978).

We must also recognize that any particular obstacle to exercising the right to choose to end a pregnancy does not exist in a vacuum. See *Whole Woman's Health*, 136 S. Ct. at 2313. Cumulative effects are relevant, especially in an environment in which very few clinics and physicians perform abortions in Indiana. The deterrence shown in this record must be understood in the larger context of the logistical puzzle that the Indiana bypass statute already requires minors to solve.

A teenager who suspects she is pregnant but who has good reasons to fear telling her parents must figure out where to go to determine whether she is pregnant, how to get there (without missing school or work and without alerting her family), and how to pay for whatever that initial visit costs. If she visits a Planned Parenthood clinic, she might find out about the possibility of a judicial bypass to obtain an abortion. If she wants to pursue that route, she must then find her way to a state court, with or without a lawyer, and persuade a judge either that she is mature enough to have an abortion without her parents' consent or that doing so would be in her "best interests." Even if she proves that she is mature enough to have the abortion without her parents' consent, Indiana's new law would allow a judge to require parental notice unless she proves that an abortion without parental notice would be in her "best interests." Planned Parenthood's unchallenged evidence shows that the existence of that additional requirement is likely to cause a significant fraction of affected young women to be too afraid to even try to seek an abortion.

None of the district court's findings are clearly erroneous. The State's position that the parental notice requirement does

not afford parents a legal *or* practical right to obstruct the
abortion stretches too far. Notice is not the legal equivalent of
consent, but a notice requirement can have the same practical
effect as a consent requirement, as *Casey* reasoned in striking
down a spousal notice requirement. 505 U.S. at 896–98; see
also *Indiana Planned Parenthood Affiliates v. Pearson*, 716 F.2d at
1132. The district court credited Planned Parenthood's evi-
dence showing that Indiana's law has the serious potential to
create that practical effect by triggering parental obstruction,
triggering hazardous self-help, and deterring some minors
from even attempting bypass. The preliminary injunction
here was appropriate because, taken individually or collec-
tively, those possibilities demonstrate serious potential for an
undue burden. The undue burden analysis can include cumu-
lative effects. See *Whole Woman's Health*, 136 S. Ct. at 2313 (de-
scribing increased driving distances as "one additional bur-
den … taken together with others").

In applying the undue burden test, we must also address
two other oddities of the notice requirement. First, the State
acknowledges that a 48-hour parental notice requirement, like
the one the Eighth Circuit addressed in *Miller*, 63 F.3d at 1458,
"raises additional questions about the opportunity for the
parents to intercede and to obstruct the abortion." The only
timing requirement in Indiana's statute is that notice be given
"before the abortion is performed." Ind. Code § 16-34-2-4(d).
That is troubling. It leaves the potential for a judge to require
notice to be given even longer in advance than in *Miller*.

The two methods the statute identifies for delivering that
notice pose similar practical problems. The statute requires
that the "attorney representing the unemancipated pregnant
minor shall serve the notice required by this subsection by

certified mail or by personal service." *Id.* That puts the minor and her lawyer in a difficult position. The lawyer cannot control the timing of delivery of a letter sent by certified mail. To comply with the requirement of actual notice before the abortion is to be performed, the lawyer will have to allow plenty of time for the letter to be delivered and received, and for the proof of receipt to be returned. As a practical matter, that is likely to require a planned delay of at least a week and perhaps longer. Abortions in Indiana require advance scheduling to comply with the State's informed-consent and cooling-off rules. See Ind. Code § 16-34-2-1.1(a).

The only alternative is personal notice to the parents, by the lawyer. Picture the scene: a stranger knocks at the door and announces to the young woman's parents that their daughter is pregnant and is seeking an abortion, that a judge has authorized the abortion, and that it will occur soon. The potential for serious trouble is self-evident, for the lawyer and for the pregnant minor and her constitutional rights. And all of this after a judge has already been convinced to bypass parental consent.

The district court's recognition of the likely practical consequences of this law is consistent with *Casey*. *Casey* distinguished its holding as to married women from the line of cases addressing parental notice or consent requirements because those cases "are based on the quite reasonable assumption that minors will benefit from consultation with their parents and that children will often not realize that their parents have their best interests at heart." 505 U.S. at 895 (opinion of the Court). Just as the *Casey* court did not have to adopt that same assumption for married women, the district court was not required to adopt it in the face of this record with

unchallenged evidence showing that the same assumption is too optimistic in a substantial fraction of relevant cases. After all, in this case, that assumption was directly refuted by evidence for purposes of the preliminary injunction.

The State argues that the notice requirement creates no additional risk for young women who fear parental notice. According to the State, these minors are "in no worse position than if [they] had not attempted bypass" because a young woman who initiates the bypass process but fails to convince a court to waive notice can make notice unnecessary by deciding not to have an abortion. The argument illustrates the potential for irreparable harm. A minor who obtains a bypass of parental consent, only to be forced to choose between parental notice and not having the abortion, will still have to weigh the consequences of notice. As the district court found, minors for whom the potential consequences include, for example, contemplating suicide or self-inducing a miscarriage, *Planned Parenthood*, 258 F. Supp. 3d at 947, citing Pinto Decl. ¶ 16, would not be in the same position as if they had never attempted bypass. They would be worse off.

Further, the State's brief acknowledges that at least one purpose of the notice requirement is to inhibit the effectiveness of the judicial bypass process itself. While the State asserts some interests that could be legitimate, at least in theory, one of the interests proffered is to "ensure that parents of minor[s] are notified of their abortions and provides safeguards for the parent-child relationship *by preventing circumvention of the consent requirement*." State's Br. at 27 (emphasis added). The very purpose of the constitutionally required judicial bypass *is* to "circumvent" the consent requirement in appropriate cases. If the State had presented evidence that the judicial

bypass procedure is being abused in some systematic way, we might see this differently. But without such evidence, the argument acknowledges that the new notice requirement is *designed* to impose a new burden on a minor exercising her constitutional right to seek a judicial bypass and thus to be able to make her own decision about her own pregnancy. Cf. *Casey*, 505 U.S. at 877 (plurality opinion) (regulation with "purpose or effect" of creating substantial obstacle to abortion decision is unduly burdensome).

Like the district court, we reject the State's and the dissent's argument that a bypass court can avoid any undue burden by simply considering the potential for abuse as part of the best-interests determination. The district court found that the trauma of even attempting to prove abuse would deter young women from pursuing bypass. *Planned Parenthood*, 258 F. Supp. 3d at 947. That finding is well-supported. It is not clearly erroneous. Indeed, the finding parallels the district court's finding in *Casey* that the Supreme Court credited. See *Casey*, 505 U.S. at 890 (opinion of the Court) (abused wives "may be psychologically unable to discuss or report the rape for several years after the incident").

Because we decide this appeal based only on an application of *Casey*'s undue burden standard, we need not and do not decide whether *Bellotti* applies to all parental notice requirements. The context of a preliminary injunction enjoining the enforcement of this statute on a limited factual record necessarily narrows our holding. The Supreme Court has announced clear bypass requirements for parental consent requirements. *Bellotti v. Baird*, 443 U.S. at 643–44 (opinion of Powell, J.) (requiring bypass based either on maturity or best interests). The open question is whether those requirements

also apply to parental notice requirements. The district court decided that the standards for parental consent requirements apply equally to parental notice requirements. *Planned Parenthood*, 258 F. Supp. 3d at 945–46. The State acknowledges that, if *Bellotti* applies to notice statutes, then the Indiana law is unconstitutional because it does not allow a bypass of notice based on maturity. Because the Supreme Court has expressly declined to decide whether *Bellotti* applies to parental notice statutes, we decline to decide this appeal on this ground. Instead, we affirm the preliminary injunction based on Planned Parenthood's evidence of likely effects, which Indiana did not rebut in the district court with evidence of its own.

As the district court noted, we applied *Bellotti* to parental *notice* requirements in the 1980s. *Zbaraz v. Hartigan*, 763 F.2d 1532, 1539 (7th Cir. 1985) ("This standard [i.e., maturity *and* best interests-based bypass] also governs provisions requiring parental notification."), citing *Bellotti*, 443 U.S. at 651 (opinion of Powell, J.), and *Indiana Planned Parenthood Affiliates Ass'n v. Pearson*, 716 F.2d 1127, 1132 (7th Cir. 1983). But since then, the Supreme Court has said that it has not decided whether *Bellotti* applies to parental notice statutes. E.g., *Lambert v. Wicklund*, 520 U.S. 292, 295 (1997) (per curiam) (reversing Ninth Circuit's invalidation of parental notice statute as inconsistent with *Bellotti* because the Court "declined to decide whether a parental notification statute must include some sort of bypass provision to be constitutional."), citing *Akron Center*, 497 U.S. 502, 510 (1990) (expressly leaving question open). We have noted this evolution before. *Zbaraz v. Madigan*, 572 F.3d at 380 & n.5 (declining to decide

applicability of *Bellotti* because parental notice statute satis-
fied *Bellotti* consent requirements).[8]

The district court acknowledged that the question whether
*Bellotti*'s requirements for parental consent statutes apply

---

[8] *H.L. v. Matheson* does not save this Indiana statute. The Court upheld
Utah's parental notice requirement with no bypass at all, but it did so be-
cause the plaintiff "made no claim or showing as to her maturity or as to
her relations with her parents." 450 U.S. 406, 407 (1981). The Court said
clearly what it was not deciding: "This case does not require us to decide
in what circumstances a state must provide alternatives to parental notifi-
cation." *Id.* at 412 n.22. Justice Powell, author of the lead opinion in *Bellotti*,
joined the *H.L.* majority opinion "on the understanding that it leaves open
the question whether [the statute] unconstitutionally burdens the right of
a mature minor or a minor whose best interests would not be served by
parental notification." *Id.* at 414 (Powell, J., concurring), citing *id.* at 412
n.22. The majority refused to "assume that the statute, when challenged in
a proper case, will not be construed also to exempt demonstrably mature
minors." *Id.* at 406 (opinion of the Court). The same assumption cannot be
made here. Indiana's statute permits bypass of the notice requirement
based on best interests but not based on maturity. See Ind. Code § 16-34-
2-4(d), (e). We have to assume that the textual difference was intentional.

In other cases, the Court has upheld parental notice statutes based on
the rationale that a parental notice statute that contains both a maturity-
and best-interests-based bypass is necessarily constitutional. In each case,
the Court upheld a statute permitting bypass based on either maturity *or*
best interests. *Wicklund*, 520 U.S. at 294 (Montana statute with notice by-
pass based on maturity, evidence of abuse, or notice not being in minor's
best interests); *Hodgson v. Minnesota*, 497 U.S. 417, 497 (1990) (Kennedy, J.,
concurring in judgment) (upholding Minnesota parental notice require-
ment with bypass based on maturity or abortion without notice in minor's
best interests); *Akron Center*, 497 U.S. at 508, 510–11 (upholding Ohio pa-
rental notice requirement with bypass based on maturity, abuse, or notice
not in best interests). We have taken the same approach. *Zbaraz*, 572 F.3d
at 374, 380 (upholding Illinois parental notice requirement with bypass
based on maturity or best interests).

equally to parental notice statutes "remains unanswered by the Supreme Court and the Seventh Circuit," but held that *Bellotti* "must" apply. *Planned Parenthood*, 258 F. Supp. 3d at 945–46. Although we otherwise agree with the district court's undue burden analysis, we affirm without deciding this question at this preliminary injunction stage.[9]

---

[9] There is certainly support in the case law for the district court's conclusion. Five Justices in *H.L.* signaled that *Bellotti* should apply to notice bypass statutes. 450 U.S. at 420 (Powell, J., joined by Stewart, J., concurring) ("In sum, a State may not validly require notice to parents in all cases, without providing an independent decisionmaker to whom a pregnant minor can have recourse if she believes that she is mature enough to make the abortion decision independently or that notification otherwise would not be in her best interests."); *id.* at 428 n.3 (Marshall, J., joined by Brennan and Blackmun, JJ., dissenting) (exception to parental notice required for emancipated minors, mature minors, and minors for whom notice would not be in minor's best interests). And the *Akron* majority observed that notice of a bypass proceeding without any exception for a mature or emancipated minor would be unconstitutional. *City of Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 441 n.31 (1983). The Sixth Circuit had upheld the ordinance's notice requirement, though, and the petitioners did not challenge that ruling. *Id.* at 439 n.29.

At least two other circuits have applied *Bellotti* to parental notice requirements. See *Causeway Medical Suite v. Ieyoub*, 109 F.3d 1096, 1112 (5th Cir. 1997) (declining to read the Supreme Court's silence as a holding that *Bellotti* does not apply to parental notice statutes), overruled on other grounds, *Okpalobi v. Foster*, 244 F.3d 405, 427 n.35 (5th Cir. 2001); *Planned Parenthood v. Miller*, 63 F.3d 1452, 1460 (8th Cir. 1995) ("In short, parental-notice provisions, like parental-consent provisions, are unconstitutional without a *Bellotti*-type bypass."). At least one other circuit has gone the other way. *Planned Parenthood of the Blue Ridge v. Camblos*, 155 F.3d 352, 373 (4th Cir. 1998) ("[W]e hold that a notice statute that [includes at least the *Hodgson* 'best interest' exception] need not include, in addition, a bypass for the mature minor in order to pass constitutional muster").

B. *Other Injunction Requirements*

Planned Parenthood showed a sufficient likelihood of succeeding on the merits to support the district court's injunction. The district court also did not abuse its discretion in concluding that Planned Parenthood satisfied the other requirements for a preliminary injunction.

First, Planned Parenthood demonstrated a likelihood of irreparable harm. In applying the undue burden standard to a restriction on abortion, it is hard to separate the merits from irreparable harm. As discussed above, the record supports the conclusion that young women would suffer irreparable harm if injunctive relief were denied. See *Doe v. Mundy*, 514 F.2d 1179, 1183 (7th Cir. 1975) (enforcement of hospital policy would violate right to privacy and cause irreparable harm); see also *Christian Legal Society v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006) (presumption of irreparable harm applies to First Amendment violations); 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (3d ed.) ("When an alleged deprivation of a constitutional right is involved, such as the right to free speech or freedom of religion, most courts hold that no further showing of irreparable injury is necessary.").

Planned Parenthood also does not have an adequate legal remedy. The State has not argued otherwise. Instead, it argues that a pregnant minor seeking a judicial bypass could challenge an adverse notification ruling by raising a constitutional challenge in an expedited appeal after the bypass proceeding. Given the time pressures at work in such cases, we reject that alternative as an insufficient answer to the burdens here. See *Fleet Wholesale Supply Co. v. Remington Arms Co.*, 846 F.2d 1095, 1098 (7th Cir. 1988) (irreparable injury implies inadequacy of

legal remedies); see also 11A Wright & Miller § 2944 ("Probably the most common method of demonstrating that there is no adequate legal remedy is by showing that plaintiff will suffer irreparable harm if the court does not intervene and prevent the impending injury.").

Because Planned Parenthood satisfied these threshold showings, the district court also balanced the equities and considered whether an injunction would be in the public interest. *Planned Parenthood*, 258 F. Supp. 3d at 955. The district court's conclusions on these points were well within the bounds of its discretion.

The district court did not err on the balance of harms. The more likely it is that a plaintiff will win on the merits, the less the balance of harms needs to weigh in the plaintiff's favor. *Planned Parenthood v. Van Hollen*, 738 F.3d 786, 795 (7th Cir. 2013); *Planned Parenthood of Indiana, Inc. v. Commissioner*, 699 F.3d 962, 972 (7th Cir. 2012); *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11–12 (7th Cir. 1992). On this record, Planned Parenthood's likelihood of success on the merits is substantial. A final judgment in Planned Parenthood's favor would not undo the irreparable harm to which its patients would have been subjected in the meantime, absent the injunction. It was within the district court's sound discretion to weigh those consequences more heavily than any irreparable harm the State faces by delay in implementing its statute.

The district court also did not err on the public interest analysis. 258 F. Supp. 3d at 955, citing *Planned Parenthood of Indiana & Kentucky, Inc. v. Commissioner*, 984 F. Supp. 2d 912, 931 (S.D. Ind. 2013). Because Planned Parenthood has shown that it is likely to succeed on the merits and that the balance of harms favors the injunction, those showings weigh more

heavily in the balance than the State's interest in enforcing a law that Planned Parenthood has shown is likely unconstitutional. See, e.g., *Preston v. Thompson*, 589 F.2d 300, 306 n.3 (7th Cir. 1978) (injunction in public interest where continuing constitutional violation is proof of irreparable harm).

For all of these reasons, the district court's preliminary injunction barring enforcement of the new parental notice requirement in Ind. Code § 16-34-2-4(d) and (e) is

AFFIRMED.

KANNE, *Circuit Judge*, dissenting. The question presented in this case is straightforward and narrow: does the Constitution prohibit Indiana from requiring a mature minor to notify her parents of an impending abortion when she cannot show that avoiding notification is in her best interests?

The Supreme Court has confirmed that both parental consent and parental notification laws are constitutional. *See Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 899 (1992) ("Our cases establish, and we reaffirm today, that a State may require a minor seeking an abortion to obtain the consent of a parent or guardian, provided that there is an adequate judicial bypass procedure."); *Ohio v. Akron Ctr. for Reprod. Health*, 497 U.S. 502, 518–19 (1990) ("We continue to believe that a State may require the physician himself or herself to take reasonable steps to notify a minor's parent because the parent often will provide important medical data to the physician."); *H. L. v. Matheson*, 450 U.S. 398, 409 (1981) ("[A] statute setting out a 'mere requirement of parental notice' does not violate the constitutional rights of an immature, dependent minor." (quoting *Bellotti v. Baird*, 443 U.S. 622, 640 (1979)); *Id.* at 413 ("That the requirement of notice to parents may inhibit some minors from seeking abortions is not a valid basis to void the statute.").

These statutes are constitutional because the State possesses "important" and "reasonabl[e]" interests in requiring parental consultation before a minor makes an irrevocable and profoundly consequential decision. *Bellotti*, 433 U.S. at 640–41 ("[P]arental notice and consent are qualifications that typically may be imposed by the State on a minor's right to make important decisions. … [A] State reasonably may determine that parental consultation often is desirable and in

the best interest of the minor."); *see also* Majority Op. at 19; *Planned Parenthood of Indiana & Kentucky, Inc. v. Comm'r, Indiana State Dep't of Health*, 258 F. Supp. 3d 929, 941 (S.D. Ind. 2017) ("[T]he law recognizes legitimate state interests in protecting children and adolescents, preserving family integrity, and encouraging parental authority.").

Indiana law requires a minor seeking an abortion to obtain consent from her parents unless she can demonstrate to a judge her maturity or show that an abortion is in her best interests. Ind. Code Ann. § 16-34-2-4(e) (2017). This statutory scheme is constitutional. *Bellotti*, 443 U.S. at 643–44.

In 2017, the Indiana General Assembly enacted a law requiring a minor seeking an abortion to notify her parents. Ind. Code Ann. at § 16-34-2-4(d). The minor may receive a judicial bypass by showing that obtaining an abortion without notification is in her best interests, but there is no exception for maturity alone. The district court concluded that the statute imposes an undue burden. The majority agrees, but I cannot.[1]

Planned Parenthood has not introduced evidence that establishes that requiring mature minors to notify their parents that they intend to have an abortion (in a scenario where the judge has found that avoiding notification is *not* in their best interests) constitutes an undue burden. We should not inval-

---

[1] I do agree, however, with the majority's determination that the statute's "requirement to serve notice is triggered only if the judge authorizes an abortion." Majority Op. at 4. The new statute does not permit "a judge to order notice to parents of a minor's unsuccessful attempt to seek bypass." *Id*.

idate a law passed by a democratically-elected state legislature "while the effects of the law (and reasons for those effects) are open to debate." *A Woman's Choice-E. Side Women's Clinic v. Newman*, 305 F.3d 684, 693 (7th Cir. 2002). Because the majority's opinion is inconsistent with our precedent—which remains good law despite the majority's suggestion to the contrary—I respectfully dissent.

## I. ANALYSIS

### 1. Parental Consent and Parental Notification Are Different

Consent and notification requirements are manifestly different, and the Court has repeatedly confirmed that its parental-consent jurisprudence does not necessarily apply to statutes imposing notification requirements. *See, e.g., Lambert v. Wicklund*, 520 U.S. 292, 295–96 & n.3 (1997); *Akron Center*, 497 U.S. at 510 ("[A]lthough our cases have required bypass procedures for parental consent statutes, we have not decided whether parental notice statutes must contain such procedures.").

We have not decided whether the judicial bypass described in *Bellotti* is required for parental notification statutes. *Zbaraz v. Madigan*, 572 F.3d 370, 380 (7th Cir. 2009). The Fifth and Eighth Circuits have held that parental-notification statutes are unconstitutional without a *Bellotti*-type bypass. *Causeway Med. Suite v. Ieyoub*, 109 F.3d 1096, 1107 (5th Cir. 1997), *overruled on other grounds by Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001); *Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d 1452, 1460 (8th Cir. 1995) ("[T]he State has no legitimate reason for imposing a restriction on [the] liberty interests [of mature, informed minors] that it could not impose on adult women."). But the Fourth Circuit has held

that, "provided that a parental notice statute does not condition the minor's access to abortion upon notice to abusive or neglectful parents, absent parents who have not assumed their parental responsibilities, or parents with similar relationships to their daughters," it is facially constitutional. *Planned Parenthood of Blue Ridge v. Camblos*, 155 F.3d 352, 367 (4th Cir. 1998).

The majority opinion opts not to decide whether to incorporate the *Bellotti*-bypass requirements into the parental notification context. I have no objection to deferring an exhaustive discussion of that issue to another day. But the majority opinion then concludes that Indiana's failure to allow judicial bypass of the notification requirement for mature minors constitutes an undue burden. Because the evidentiary basis for that conclusion is entirely speculative, I cannot agree.

*2. The Preliminary Injunction Record and Decision*

As the moving party, Planned Parenthood bears the burden of justifying an injunction. *Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't Health*, 699 F.3d 962, 972 (7th Cir. 2012). We shouldn't lightly substitute our judgment for the General Assembly's, especially when "the effects of the law (and reasons for those effects) are open to debate." *A Woman's Choice*, 305 F.3d at 693. Our constitutional system encourages legislative experimentation, and we must be "ever on our guard" when exercising our authority to coun-

termand democratic impulses. *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting).[2]

At the preliminary injunction hearing, Planned Parenthood introduced seven declarations supporting its motion. I limit my review to the portions of the declarations which the district court considered in connection with its undue burden analysis. Forest Beeley, the Director of Surgical Services for Planned Parenthood, testified that minors often do not wish to inform their parents they are seeking an

---

[2] As the majority notes, Majority Op. at 10–13, the Supreme Court has inconsistently articulated the standard for pre-enforcement injunctions of statutes regulating abortion. *Compare United States v. Salerno*, 481 U.S. 739, 745 (1987) (stating that, outside the First Amendment context, "the challenger must establish that no set of circumstances exists under which the Act would be valid"), *and Gonzales v. Carhart*, 550 U.S. 124, 167 (2007) ("The latitude given facial challenges in the First Amendment context is inapplicable here" in the abortion context.), *with Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309 (2016) (conducting an undue burden analysis without first discussing the standard the plaintiff must meet), *and Stenberg v. Carhart*, 530 U.S. 914, 921 (2000) (same). We highlighted this confusion in *A Woman's Choice* and attempted to synthesize the Supreme Court jurisprudence: the *Salerno* standard is relaxed in the abortion context, but we do not "ignore the fact that enforcement has not commenced" when reviewing an injunction. 305 F.3d at 687.

The majority suggests that *A Woman's Choice* is no longer good law because, in *Whole Woman's Health v. Hellerstadt*, the Supreme Court once again conducted an undue burden analysis without discussing the procedural context of the challenge. 136 S. Ct. 2292, 2309–10. *Hellerstadt* does not resolve the contradictions in the Supreme Court abortion jurisprudence; it deepens them. Like *Stenberg* and *Casey*, the Court simply ignored the language from *Salerno* and *Gonzales* indicating that pre-enforcement injunctions require special justification.

abortion because of "a fear of being kicked out of the home, a fear of being abused or punished in some way, and a fear that the parent will attempt to block the abortion." R. 14-1, Beeley Decl. at 4. Kathryn Smith—a former Planned Parenthood employee and current volunteer "Indiana bypass coordinator"—testified regarding her experience in attempting to find volunteer attorneys to represent minors in judicial bypass proceedings. She testified that minors typically do not wish to tell their parents because they fear their parents will "throw them out of the house or … punish them." R. 14-3, Smith Decl. at 3; *see also* R. 14-4 , Glynn Decl. at 3; R. 14-5, Flood Decl. at 2 ("Two of the women expressed concerns about abuse if their parents discovered they had an abortion."). Smith testified that the judicial bypass process is "incredibly daunting and intimidating." *Id.* at 4.

Finally, Planned Parenthood (and the district court) relied heavily upon Dr. Suzanne M. Pinto's declaration. Dr. Pinto works as a psychologist in Colorado and specializes in treating abused minors and victims of domestic violence. She detailed examples of sexual and physical abuse inflicted by parents on minors. And she noted that "[p]regnancy is a particular flash point. As a physical manifestation of sexual activity pregnancy can signify a teen's independence from parental control." R. 14-6, Pinto Decl. at 5.

Dr. Pinto asserted that, if the statute stands, abused minors will summarily reject judicial bypass as an option out of "fear of exposing their abuse, fear or being forced to describe their abuse to strangers in an adversarial court hearing, fear that that they or their families will get into trouble if they bring up the abuse, and fear" of increased abuse at home. *Id.* at 8; *see also* R. 14-7, Lucido Decl. at 4 ("In many cases, teens

seeking a judicial bypass have abusive parents, and the young women have a well-founded fear based on past experience that if one or both of her parents were to learn of the pregnancy or the minor's desire to have an abortion, it would precipitate additional abuse."). Dr. Pinto thus argues that minors will be unable to make the full disclosure that the "best interests" exception would require. Pinto Decl. at 8,[3] *see also* Lucido Decl. at 7–8 (detailing the practical challenges a minor in an abusive home may face if attempting to obtain a judicial bypass).

The district court credited the testimony that minors may encounter post-notification obstruction by parents. 258 F. Supp. 3d at 946. The district court further emphasized that "a large number of minors may face the risk of domestic abuse at the hands of one or more of their parents in the event that a parent is notified of the minor's pregnancy." *Id.* (citing Pinto Decl. at 4). The court was particularly concerned that the "fear of retaliatory abuse" might deter a minor from even attempting to obtain judicial bypass (even if she could satisfy the "best interests" exception). *Id.* at 947. The district court's undue burden analysis might be summarized by this passage discussing the harms posed by the new statute:

---

[3] Dr. Pinto seemed to believe that the challenged statute requires parental notice "even if the court has not yet ruled upon, or has denied, the minor's petition to make the abortion decision without parental consent." *Id.* at 4. As indicated above, I join the majority's rejection of that interpretation: the statute requires notice only upon the determination that an abortion is to occur.

> [F]or many young women in Indiana, the require-
> ment of providing parental notification before ob-
> taining an abortion carries with it the threat of do-
> mestic abuse, intimidation, coercion, and actual
> physical obstruction. The State's argument that
> those seeking to challenge the law must wait until
> evidence of this type of harm accrues is simply in-
> correct. The Court need not sit idly by while those
> most vulnerable among us are subjected to un-
> speakable and horrid acts of violence and perver-
> sion, nor may we blind ourselves to the fact that for
> millions of children (including young women) in
> the United States the threat of such abuse is real.

*Id.* at 939 (citing Pinto Decl. at 4).

### 3. *The Statute Does Not Impose an Undue Burden*

Given this evidentiary background, the district court concluded—and the majority agrees—that the new Indiana statute imposes an undue burden. But I disagree. Consider the following scenarios: if the minor cannot satisfy the maturity or "best interests" exceptions, she cannot obtain a judicial bypass for either consent or notification (and that is constitutional, per *Bellotti*). If she can show that obtaining an abortion without involving her parents is in her best interests, she can obtain judicial bypass of both consent and notification. If she can show maturity but not that obtaining an abortion without involving her parents is in her best interests, she can obtain judicial bypass of consent but not of notification. Is that an undue burden?

*A. Evidence Regarding At-Risk Minors Does Not Establish the Need for a Maturity Exception*

In finding that it is an undue burden, the district court and majority rely on evidence that minors in abusive homes will be at risk if their parents discover that they plan to have an abortion. But the "best interests" exception completely covers that scenario. If the minor can demonstrate a likelihood of retributive abuse, the court will conclude that the minor's best interests require bypassing the notification requirement. Planned Parenthood has not identified an instance where an Indiana court rejected a minor's "best interests" argument and required parental consent, but abuse followed.

State-imposed restrictions on mature minors cannot, by themselves, be constitutionally problematic. "[A] state legislature has constitutional power to utilize, for purposes of implementing a parental-notice requirement, a yardstick based upon the chronological age of unmarried pregnant women. That this yardstick will be imprecise or even unjust in particular cases does not render its use by a state legislature impermissible under the Federal Constitution." *Matheson*, 450 U.S. at 425 (Stevens, J., concurring). Would we invalidate a law that requires parental consent for a minor to marry because it did not include an exception for minors who can demonstrate their maturity? *See Obergefell v. Hodges*, 135 S. Ct. 2584, 2599 (2015) ("[T]he right to personal choice regarding marriage is inherent in the concept of individual autonomy."); *Matheson*, 450 U.S. at 425 n.2 (Stevens, J., concurring) ("Instead of simply enforcing general rules promulgated by the legislature, perhaps the judiciary should grant hearings to all young persons desirous of establishing their

status as mature, emancipated minors instead of confining that privilege to unmarried pregnant young women.").

A minor's maturity has no relation to the likelihood of abuse (or, at least, Planned Parenthood has not introduced evidence explaining why that might be so). *See Camblos*, 155 F.3d at 373 ("A notice requirement does not become a veto merely because the minor has become mature enough that she must be allowed to decide for herself whether to end her pregnancy."); *see also Matheson*, 450 U.S. at 425 (Stevens, J., concurring) ("Almost by definition, however, a woman intellectually and emotionally capable of making important decisions without parental assistance also should be capable of ignoring any parental disapproval. Furthermore, if every minor with the wisdom of an adult has a constitutional right to be treated as an adult, a uniform minimum voting age is surely suspect."). Thus, Planned Parenthood's evidence regarding at-risk minors is irrelevant to the question of whether the Constitution requires an exception to parental notification for mature minors.

When a court concludes that a minor is mature enough to decide to have an abortion but also that the minor's best interests would be served by notifying her parents, the State has a legitimate and significant interest in requiring that notification. *Camblos*, 155 F.3d at 374 ("[E]ven the most mature teenager will benefit from the experienced advice of a parent, and, as a consequence of that dialogue, make a more informed, better considered, abortion choice."). Abortion can be emotionally and physically traumatic for adult women. *See McCorvey v. Hill*, 385 F.3d 846, 850–51 & n.3 (5th Cir. 2004) (Jones, J., concurring) (collecting clinical and scientific studies). As Planned Parenthood notes, teenage women are a par-

ticularly vulnerable demographic, and studies indicate they face an exceptionally high risk of suicidal ideation and emotional turmoil following an abortion. *See Amicus* Br. of Arizona at 11 (citing three studies finding significant mental health risk for post-abortion adolescents, including one study which found a 50% chance of suicidal ideation). A mature minor may wish to keep her abortion secret from her parents and yet benefit greatly from their support before and in the aftermath.

*B. The Risk of Deterrence Inherent in Judicial Bypass Proceedings Cannot be an Undue Burden*

Perhaps recognizing that the evidence regarding the challenges for abused minors is unrelated to the maturity exception, the majority argues that "the potential for parental notice is a threat that may deter [minors] from even attempting bypass in the first place." Majority Op. at 24. In other words, the notification requirement will deter minors from attempting bypass—even if they would qualify under the "best interests" test—because the mere possibility of their parents discovering "would be a deal breaker." Smith Decl. at 4.

Because the State put on no evidence of its own, I assume that possibility to be a concern. But that logic applies equally to judicial bypass requirements for parental consent statutes. If the minor does not succeed in obtaining judicial bypass, then the minor must obtain the consent of her parents (which, of course, necessarily includes notice of her pregnancy). Certainly, the possibility that a minor might have to obtain her parents' consent could deter her from seeking judicial bypass. Indeed, the risk of deterrence applies with greater force to parental-consent statutes. *See Akron Ctr.*, 497 U.S. at 510 (explaining that consent statutes involve "greater

intrusiveness" than notification statutes). Yet the Supreme Court has repeatedly confirmed that parental-consent statutes, subject to the *Bellotti* exceptions, are constitutional.

And there are persuasive reasons why requiring mature minors to notify their parents poses a lesser risk of deterrence. There is a direct relationship between the likelihood of deterrence and the likelihood that the minor will satisfy the "best interests" test. The higher the possibility that the minor will be abused if her parents discover her pregnancy, the higher the likelihood that the court will grant a judicial bypass for notice. If the minor cannot show that likelihood of mistreatment, she will be less likely to satisfy the "best interests" tests but also less likely to be deterred by the potential consequences of her parents discovering her pregnancy. And, similarly, the more mature the minor, the lower the risk that parental notification will result in a "practical veto." Majority Op. at 15; s*ee also Camblos*, 155 F.3d at 373 ("[T]here is every reason to believe that the burden imposed upon the mature minor by a parental notice requirement will actually be less onerous than that imposed upon the immature minor."). *Bellotti* demonstrates that the burdens inherent in judicial bypass proceedings cannot be undue.

And that's all the evidence which Planned Parenthood introduced: several declarations from individuals involved in the bypass process discussing their personal observations and anecdotes and a declaration by one child psychologist discussing the challenges which children in abusive homes face in obtaining abortions. There's no evidence regarding why a notification requirement will substantially obstruct mature minors (when the court has concluded that the child's best interests warrant notification) from obtaining an

abortion. There's no evidence comparing the decision-making process for immature minors with that of mature minors. And there's no evidence regarding how, in practice, the inclusion of a "best interests" exception and the exclusion of a maturity exception will influence minor decision-making.

That's because, of course, Indiana "has been disabled from implementing its law and gathering information about actual effects." *A Woman's Choice*, 305 F.3d at 687. This is the same fundamental problem that necessitated reversal of the permanent injunction in *A Woman's Choice*. The district court's issuance of a pre-enforcement preliminary injunction prevented collection of actual data about the law's effects. During the bench trial, the district court reviewed data from other states, but those studies did not adequately account for "state-specific characteristics." *Id.* at 690. That reliance on data from other communities and utter lack of Indiana-specific information is why the "pre-enforcement nature of th[e] suit matter[ed]." *Id.*; *see also id.* at 692 ("If Indiana's emergency-bypass procedure fails to protect Indiana's women from risks of physical or mental harm, it will be a failure *in operation*; it is not possible to predict failure before the whole statute goes into force.").

The majority dismisses *A Woman's Choice* because we are reviewing a preliminary injunction, not a permanent injunction. But the court in *A Woman's Choice* reversed the permanent injunction because the record contained no data about the actual or likely effects of the Indiana statute *specifically*. And collecting that data was impossible because the district court issued a preliminary injunction. Thus, the entire course of litigation in *A Woman's Choice* involved pre-enforcement

speculation about the statute's effects. That problem is also present here. Generalized information about abortion regulation writ large cannot substitute for specific, tailored data regarding the statute at issue. *See id.* ("Indiana is entitled to an opportunity to have its law evaluated in light of experience *in Indiana.*"). To call this reasoning in *A Woman's Choice* dicta is to misunderstand the majority opinion in that case.[4]

To the extent Planned Parenthood may believe that the notification statute will have unanticipated or inexplicable effects, the proper time to bring the challenge is after enforcement has revealed those effects. *Id.* at 693.[5]

---

[4] The majority argues that the State must introduce actual evidence about the benefits and burdens imposed by the statute and suggests that it can still do so at trial. But, like in *A Woman's Choice*, the preliminary injunction will prevent the State from defending its statute with actual operational data at trial. The majority distinguishes *A Woman's Choice* on procedural grounds without recognizing that affirmance will put the State in the position we found so problematic in *A Woman's Choice*.

[5] The majority also suggests that *A Woman's Choice* has been rendered irrelevant by the Supreme Court's decision in *Hellerstadt*. Majority Op. at 11–12. As explained above, *Hellerstadt* ignored seemingly contradictory jurisprudence and so does not clarify the confusion we identified in *A Woman's Choice*. More importantly, *Hellerstadt* involved a district court record that contained eight peer-reviewed studies regarding the likelihood of abortion complications and testimony from at least four experts regarding the same. 136 S. Ct. at 2311. The present record contains essentially no comparable empirical data. To the extent that Dr. Pinto's declaration qualifies as expert testimony, Planned Parenthood hasn't shown why the information regarding abused minors demonstrates the necessity of a maturity exception. *A Woman's Choice* supports reversal here because, like in that case, the party seeking invalidation of the statute has not provided probative evidence of an undue burden.

## II. CONCLUSION

The challenged Indiana statute requires parental notification but allows for judicial bypass of that requirement when it would be in the minor's best interests. Planned Parenthood provided evidence that obtaining parental notification will often not be in the minor's best interests, but the statute already complies with Supreme Court jurisprudence focused on those concerns.

The operative question is whether, given the State's manifest interest in involving parents in consequential decisions by their children, the notification requirement constitutes a substantial obstacle for mature minors. The record provides no clarity on that point, and so—because the law was enjoined pre-enforcement—we can only speculate. As the majority recognizes, "evidence matters." Majority Op. at 16.

The district court abused its discretion by enjoining the law pre-enforcement, and its decision should be reversed.